Heather Cohen, Plaintiff Pro Se
King Cohen, Plaintiff Pro Se
1035 Olive Ave.
Ramona, CA 92065
Telephone: (808) 631-7338 / (858) 663-1424
Emails: atarahcohen@gmail.com; 67kingdavid.cohen@gmail.com

**FILED**

Feb 09 2026

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY         s/ GloriaVocal         DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER COHEN a.k.a. MRS. DOOM and KING COHEN a.k.a. Prof. DOOM xXx<br><br>Plaintiffs,<br><br>v.<br><br>MARION JOYCE BOURKE, et al.,<br><br>Defendants. | Case No. **'26 CV 0802 JO   VET**<br><br>**COMPLAINT**<br><br>Hearing Date:   None Set.<br>Time:   None Set.<br>Courtroom:   None Set<br>District Judge:   None Set<br>Trial Date:   None Set<br>Action Filed:   Feb. 9, 2026 |

## COMPLAINT FOR DAMAGES

## I.  INTRODUCTION

A.  This is a civil rights action arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

1.  Plaintiffs bring this action to redress a coordinated course of conduct in which private individuals, acting in concert with state actors, caused false complaints, sham enforcement actions, and governmental investigations to be initiated against Plaintiffs without lawful basis.

2.  Defendants' actions resulted in the misuse of governmental authority, denial of procedural protections, retaliation for protected activity, and the creation of an ongoing threat to Plaintiffs' safety and family integrity.

3.  State actors, including a County planning official and a sworn deputy sheriff, acted under color of state law by transmitting false allegations, facilitating selective enforcement, and refusing to document credible threats, thereby enabling continued misconduct by private defendants. Private defendants knowingly supplied false information and instigated governmental action, rendering them willful participants in joint action with state actors and subject to liability under § 1983. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered constitutional deprivations, emotional distress, reputational harm, and continuing fear of retaliation.   Plaintiffs seek declaratory, injunctive, and monetary relief to vindicate their constitutional rights and to prevent further misuse of governmental processes.

## II. TABLE OF CONTENTS

Introduction…1

Table of Contents…2

Jurisdiction and Venue…3

Parties…3

Factual Allegations…5

1- 39 Causes of Action…93

Prayer for Relief…136

Request for Bench Trial…136

Conclusion…137

## II. JURISDICTION AND VENUE

A.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

1.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts as Plaintiffs' federal claims. Defendants   Jonathan Leyva and Deputy Valencia (#19778) are state actors who, at all relevant times, acted under color of state law. Defendants Victor Smith and Marion Joyce Bourke are private individuals who knowingly and willfully participated in joint action with state actors, including by supplying false information, instigating enforcement actions, and causing governmental investigations and coercive conduct to be initiated against Plaintiffs.   Through this joint action, Defendants Smith and Bourke became willful participants in state action and are liable under 42 U.S.C. § 1983. Venue   is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred within the Southern District of California, and all Defendants reside or conduct relevant activities within this District.

## III.   PARTIES

A.    Plaintiff Heather Cohen is a resident of San Diego County, California, and at all relevant times was the lawful occupant of the property located at 1035 Olive Avenue, Ramona, California. Plaintiff King Cohen is a resident of San Diego County, California, and the spouse of Plaintiff Heather Cohen.

**B.** Defendant Victor Smith is, and at all relevant times was, a private individual residing in San Diego County, California. Defendant Smith repeatedly invoked alleged government "connections," initiated false complaints, and knowingly caused state actors to take adverse action against Plaintiffs.

**C.** Defendant Marion Joyce Bourke is, and at all relevant times was, a private individual residing in California. Defendant Bourke knowingly fabricated false reports, falsely attributed governmental investigations to Plaintiffs, and supplied false information that was foreseeably relied upon by state and federal agencies, thereby participating in joint action with state actors.

**D.** Defendant Jonathan Leyva is, and at all relevant times was, a Planning and Development Services Land Use Technician II employed by the County of San Diego. Defendant Leyva acted under color of state law and is sued in his individual capacity.

**E.** Defendant Deputy Valencia (#19778) is, and at all relevant times was, a sworn deputy with the Ramona Sheriff's Department, County of San Diego. Defendant Valencia acted under color of state law and is sued in his individual capacity for affirmative acts and omissions that deprived Plaintiffs of constitutional rights.

**F.** Defendant Israel Garcia is, and at all relevant times was, a Planning and Development Services Land Use Code Enforcement Officer employed by the County of San Diego. Defendant Leyva acted under color of state law and is sued in his individual capacity.

**G.** Defendants Leyva Garcia and Valencia are sued in their individual capacities only.

**H.** County of San Diego

**I.** DOES 1–20 are persons whose true names and capacities are presently unknown to Plaintiffs, who participated in, authorized, ratified, or knowingly failed to prevent the unlawful conduct alleged herein. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. DOES 1–20 each acted under color of state law or in joint action with named Defendants, and each Doe Defendant's conduct was a proximate cause of Plaintiffs' injuries.

## V. FACTUAL ALLEGATIONS

### Background and Context

1. Plaintiffs Heather Cohen and King Cohen reside at 1035 Olive Avenue, Ramona, California, and lawfully occupy the property with their eight (8) minor children.

2. Defendant Victor Smith resides in close proximity to Plaintiffs and controls or exerts influence over a private roadway and easement that Plaintiffs must traverse for daily access to their home.



3. Over an extended period, Defendant Smith repeatedly asserted that he possessed "connections" within County government and law enforcement and that he could cause adverse governmental action to be taken against Plaintiffs at will.

4. Defendant Victor Smith is step-father to Defendant Marion Joyce Bourke.

5. Plaintiffs and neighboring residents understood these statements as threats, given Smith's repeated invocation of government authority and subsequent enforcement activity.

## DECLARATION OF DENNIS GARCIA

I, Dennis Garcia, declare as follows:

1. I am an adult resident of San Diego County, California. I reside with my wife, Maleniee Garcia. I am competent to testify to the matters stated in this declaration, and all statements are based on my personal knowledge.

2. I am a neighbor of Heather Cohen and King Cohen, and I am also a neighbor of Victor Smith.

3. Beginning in or about 2024 and continuing through the present, I have personally experienced repeated harassment, intimidation, and disturbance by Victor Smith, including conduct directed at me, my wife, our guests, and our household.

4. Victor Smith has repeatedly called law enforcement regarding my household without legitimate cause, including during peaceful family gatherings, cookouts, and visits by relatives.

5. These repeated police calls have caused me embarrassment, anxiety, and concern that ordinary family activities would again result in law enforcement involvement.

6. Victor Smith has repeatedly claimed that the shared easement in front of our homes is "his road" and has attempted to impose his own rules regarding its use, threatening consequences if we do not comply.

7. On or about January 6, 2026, Victor Smith approached me on the shared easement in front of my home and the Cohen home. He was uninvited and without provocation and was walking a pit bull dog that he had never previously walked on this easement during the three years we have lived there.

8. During this encounter, Victor Smith used aggressive and threatening profanity, raised his voice, and acted in a confrontational manner. He stated that he was "calling the Sheriff" and that law enforcement would be coming the next morning to remove a "felon" allegedly living in my home.

9. These statements were based on Victor Smith's personal assumptions and beliefs. I understood them as threats intended to intimidate me through the misuse of law enforcement.

10. During the same incident, Victor Smith took photographs of nearby homes and of children present in the area. This conduct caused me to fear for my safety and the safety of others present.

11. Following this incident, on January 6, 2026, I joined with my wife, Heather Cohen, and King Cohen in signing and sending a Cease and Desist Notice With Offer to Resolve, requesting that Victor Smith stop harassing, threatening, intimidating, surveilling, and

1

-6-

involving law enforcement without cause. Victor Smith replied that same day that he would not comply with our request.

12. The weekend after the Cease and Desist Notice was sent, Victor Smith called law enforcement to my home at least five times during a family gathering, despite no emergency or disturbance occurring.

13. Despite receiving written notice, Victor Smith has continued the same pattern of conduct, including repeated police calls, following our guests to local stores, filming them, and accusing them of being "felons."

14. On or about January 26, 2026, the Cohens asked whether my wife and I would assist in delivering court temporary restraining order documents to Victor Smith. We declined because we feared for our safety.

15. My wife expressed concern that Victor Smith might shoot us due to his unpredictable behavior and statements about possessing firearms. Based on my own interactions with Victor Smith, I shared this fear.

16. Victor Smith's conduct has interfered with my quiet enjoyment of my home, caused emotional distress, and created ongoing fear of further harassment and escalation.

17. I have also personally observed the impact of Victor Smith's conduct on the Cohen family, including their increased isolation and the installation of security measures to protect themselves from continued harassment.

18. I am submitting this declaration voluntarily as a witness to the pattern of harassment and intimidation that I personally have experienced and observed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on __2/7/2026__2026, at __San diego__, California.

Dennis Garcia

2

DECLARATION OF MALENIEE GARCIA

I, Maleniee Garcia, declare as follows:

1. I am an adult resident of San Diego County, California. I reside with my husband, Dennis Garcia. I am competent to testify to the matters stated in this declaration, and all statements are based on my personal knowledge.

2. I am a neighbor of Heather Cohen and King Cohen, and I am also a neighbor of Victor Smith.

3. Beginning in or about 2024 and continuing through the present, I have personally experienced repeated harassment, intimidation, and disturbance by Victor Smith, including conduct directed at me, my husband, our guests and our household.

4. Victor Smith has repeatedly involved law enforcement against our household without legitimate cause, including calling the police during ordinary family gatherings, cookouts, and visits by relatives. These events were peaceful, lawful, and non-disruptive.

5. As a result of these repeated police calls, I have felt intimidated, anxious, embarrassed and fearful that ordinary family activities could again result in police involvement.

6. Victor Smith has also demanded that the easement in front of his home is "His Road" and demands we follow his rules and regulations regarding the road, or we will face consequences.

7. On or about December 2, 2025, I directly asked Victor Smith to leave me out of ongoing disputes. Instead of respecting this request, he made statements that I perceived as intimidating and retaliatory.

8. On multiple occasions, Victor Smith has made indirect threats, often framed as statements about what "someone" might do, or what "could happen," but always in a manner that suggested imminent consequences if we did not comply with his demands. Demands such as "If you want to stay out of this, you better stop talking to Joy" (Joy is his step daughter) and clean up his yard or "if *somebody* was to call animal control on you, your sheep cannot be within 50 feet of your structure. So like I said, I aint calling nobody, I'm asking respectfully, if you guys can get that cleaned up…"

9. Victor Smith has followed through on these threats by reporting me to the city code compliance officers which are closed and or in dispute. His claims are false and retaliatory. His actions are pernicious.

10. On or about January 6, 2026, Victor Smith approached my husband, Dennis Garcia, on the shared easement in front of my home and the Cohen home. Smith was uninvited and without provocation, while walking a pit bull dog (a dog he has never walked on this easement in the 3 years of us living at this home). During this encounter, Victor Smith threatened lawfare, used aggressive and threatening profanity, raised his voice, while provoking his dog to bark and act aggressive as well, and stated that he was "calling the Sheriff" and they will be here in the morning to get the "felon" living at my home.

-8-

Regardless of Victor Smith's unsupported assumptions and belief, I understand that even if his claims were true, this is not illegal nor does it warrant a call to Law enforcement. However, harassment, false reporting and retaliatory, malicious use of state and government agencies is illegal. (CCP§ 527.6) During that same incident, Victor Smith took photographs of nearby homes and of children present in the area. This conduct caused me to fear for my safety and the safety of the children present.

11. Following that incident, on January 6, 2026, due to fear and escalating hostility, I joined with Dennis Garcia, King Cohen, and Heather Cohen, in signing and sending a "Cease and Desist Notice With Offer To Resolve," requesting that Victor Smith stop harassing, threatening, intimidating, and involving law enforcement without cause. Victor replied the same day that he will "not comply."

12. The weekend after the Cease and Desist Notice was sent, Victor Smith called law enforcement to my home during a family cookout at least five times, without any legitimate emergency.

13. Despite this written notice, Victor Smith has continued to engage in the same pattern of behavior, including continued repetitive police calls, following my house guests to local stores and filming them in the store because he believes they are "felons" and intimidating communications.

14. On or about January 26, 2026 the Cohens asked if my husband and I would deliver Victor Smith court TRO documents, we declined. Not because we didn't want to help them feel safe, rather because we feared for our safety. I explained to the Cohens I thought Victor Smith "might shoot us because he is so unpredictable." Victor had made several claims about having many firearms in his home.

15. The cumulative effect of this conduct has interfered with my quiet enjoyment of my home, caused intentional infliction of emotional distress, and made me fearful of further unlawful surveillance, harassment, and threats of continuous escalation.

16. I have also witnessed the impact of the ongoing threats to Heather Cohen and the Cohen household. The family has had to install expensive cameras, and private property signs in attempts to keep Smith from continuing to harass them. I also witnessed the newly isolated Cohen family, in the recent weeks they have stayed inside at home when they were previously always outside enjoying their yard and newly built outdoor living area. The Cohen Family appears to be more isolated and reserved.

17. I am submitting this declaration voluntarily as a witness to the pattern of harassment and intimidation I personally have and continue to experience from Victor Smith.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ___2/7/___, 2026, at __San Diego__, California.

Maleniee Garcia

2

**Timeline of Events**



**2020**
Cohen's bought
Victor Smith's
family dinner

Victor Smith
harassed Heather
Cohen in Her
Vehicle.

**2025**
Cohens build
pool and city
requires septic
layout before
build.

**2025**
Victor Smith
assumes wrong,
reports Cohens for
unpermitted septic

'ictor Smith f.
report causes
Cohens violat

Victor Smiths
Daughter uses
Heather Cohens
name for SSI
report

**Nov. 30, 202**
Victor Smith's
other Daughter
confronts Heather
Cohen about SSI
:port

**December 1, 2025**
Smith's Daughter
admits to wrongly
using Heather's
name for SSI
report

January 6, 2(
Victor Smith
:ought his pit
on Cohen's
property to harass
neighbors

**January 6, 2026**
Cohen's and
neighbors
Garcia's sent
Cease and Desist
to Smith

Victor Smith
responds, " I will
not comply"



**nuary 7, 202(**
Heather Cohen
tried to thank
Smith and Smith
:atens CPS an
:veals motive

Cohen's
disabled chided
elopes from h

**January 8, 2**
King Cohen
walking w/ son
:esting trackeı
Victor Smith

**nuary 9, 202(**
CPS starts
investigation
based off Victor
Smith's false
port of abuse.

**January 10, ؛**
Victor Smith
mounts skidsteer
and drives it at
Heather Cohen

**ıuary 10, 202**
Police Report
made against
Victor Smith

CPS visited
Cohen's home;
Closed case
finding no
evidence
supporting re:

**ıuary 14, 202**
:tor Smith filɛ
a TRO against
Heather Cohen
with lies

to personally
serve Heather
Cohen

**ıuary 26, 202**
King Cohen files
a TRO against
:tor Smith wit
evidence and is
'ully granted

**January 29, ؛**
Victor Smith is
personally seı
with King
Cohen's fully
granted TR



**Initiation of False Complaints and Governmental Coordination**

6. On or about October 10, 2025, Defendant Smith initiated complaints alleging that Plaintiffs had installed an unpermitted septic system and engaged in unpermitted construction.



**Layva Transmitted Allegations Without Investigation**

7. On the same date, Defendant Jonathan Leyva, a Planning and Development Services Land Use Technician II for the County of San Diego, transmitted an email to County officials expressly conveying Defendant Smith's allegations regarding Plaintiffs' property.

-13-

8. Defendant Leyva's communication did not reflect an independent investigation, neutral intake, or verification of facts. Instead, it transmitted Smith's personal allegations as the basis for governmental action.

9. On information and belief, Defendant Leyva forwarded this same communication back to Defendant Smith on October 10, 2025, confirming that Smith's allegations had been received and acted upon by the County.

10. Also on October 10, 2025, County enforcement records reflect the opening of an "anonymous" complaint alleging unpermitted accessory dwelling units, garage conversion, and occupied sheds at Plaintiffs' property.

11. That "anonymous" complaint was marked closed within hours, without citation or violation.



12. On the same date, a separate County enforcement action was opened and marked "in violation," alleging substantially identical conduct, despite no new evidence or intervening facts. The timing, duplication, and substance of these enforcement actions demonstrate that Defendant Smith's allegations were repurposed and recharacterized through governmental channels, rather than independently generated through neutral enforcement procedures.

Home    APCD    AWM    DEHQ    DPW    **PDS**

Apply for a Record        Search Records

**Record ID PDS2025-ENFGEN-001598:**
**General Enforcement**
**Record Status: In Violation**

Record Info ▼                Payments ▼

**Record Details**

**Project Description:**
UNPERMITTED ADU BEING BUILT - GARAGE CONVERSION - OCCUPIED SHEDS

▼More Details
⊟ Application Information
   COMPLAINT INFORMATION
   Office:              Kearny Mesa
   Community:           RAMONA
⊟ Parcel Information
   Parcel Number:                              Domain:
   280-110-55-00                               CN

| PDS2025-ENFGEN-001598 | 10/10/2025 | General Enforcement | 1035 OLIVE AVE, RAMONA CA 92065 | In Violation |

**Officer Garcia predetermined a violation before inspection, thereby depriving Plaintiffs of a neutral decision-maker and meaningful pre-deprivation process.**

13. October 15, 2025; Code Compliance Officer Israel Garcia arrived on the property under the pretense of "investigating" a complaint concerning an alleged "Unpermitted Structure / Accessory Dwelling Unit (ADU)."

Yet Officer Garcia's findings were not findings at all—they were a mosaic of terrifically tenuous assumptions, cobbled together with a recklessness that betrays both competence and candor. His conclusion hangs by six sickly fraying threads of falsehood, each more brittle than the last.

14. Firstly, as to the Phantom "Anonymous Complaint". The origin of this entire matter traces back to one man: Victor Smith, whose initial grievance accused the property of installing an unpermitted septic system. That complaint—filed anonymously, sustained by no evidence, and resolved with no violation found—should have died a quiet administrative death. No further enforcement was justified. No substantive investigation was authorized. No probable cause existed. And yet, the corpse of that failed complaint did not remain buried. Like a macabre artisan straight out of Buffalo Bill's wild imagination, Officer Garcia took the skin of a dead case and draped it across a new narrative—pretending that the "Anonymous Complaint" concerning septic systems had somehow resurrected itself as a complaint about an ADU. But from skin to core, the truth is painfully obvious: an anonymous complaint comes from an anonymous person. Here, however, the anonymity originated not with a private citizen, but with the government itself, which cloaked its own reinvention of the claim in the costume of a citizen report. The "anonymous complaint" was not used as alleged. It was invented, repurposed, and misrepresented.

15. Secondly, as to the Mythical 370-Square-Foot "ADU". One must ask: What instrument of measurement did Officer Garcia wield to arrive at 370 square feet? Metric? Imperial? Mystical? Perhaps this is a mystery for Sherlock Holmes. Indeed Holmes tells us, "There is, in the end, nothing more deceptive than an obvious fact."

-16-

Or in other words, something appearing to be a simple, obvious fact can be misleading. And by Garcia's own admission, he never once measured the structure. Thus the figure, this obvious fact is nothing but speculative fiction—a number conjured solely to validate the theory he was already committed to. In the official record, the structure had long been classified as a utility shed, documented as such since 2001. Yet Garcia, in the span of weeks, transformed this modest utility room into a mythical, mammoth "ADU," then reverted back to "utility shed" when confronted with dispositive evidence on October 22, only to relapse into calling it an ADU again by November 24. His position drips with contradiction—like a leaky faucet on an assembly line, changing its tune with each turn of the handle. The structure cannot be both the fabled ADU and the proven utility shed. Yet Garcia insists on inhabiting both realities at once.

16. Thirdly, as to Electricity: The Great Electric Red Herring. The possible presence of electricity—possible, not proven—became yet another leg in Garcia's four-legged golem. But electricity does not create residential use. Electricity does not transform a utility shed into an ADU. Electricity does not generate probable cause. Even if electricity were present, the law is crystal clear: a permit is not necessarily required, and such presence does not support Garcia's escalation.

17. Fourthly, as to the Silver Chevy: A Non-Fact Presented as Fact. The silver Chevy parked in front of the structure is perhaps the most comically impotent "evidence" in this case. A vehicle parked near a shed proves only one thing—that a vehicle is parked near a shed. It does not signal habitation. It does not create a violation. And it certainly does not supply probable cause, especially when Garcia was explicitly told that the vehicle belonged to the property owner.

Yet Garcia attempts to alchemize this mundane fact into suspicion. It is an act of bureaucratic sorcery without substance.

18. Fifthly, The Government's Manufactured the Cause. The original complaint—Smith's vendetta about a septic system—failed. No violation existed. No enforcement action could be taken. Thus, the plaintiffs were never formally accused of wrongdoing. But rather than close the file, the government rummaged through its cauldron and threw in the closest half-matching ingredient it could find, hoping the stew would still pass for evidence. Which is more plausible? (A) That the government, upon realizing the original complaint lacked merit, closed the investigation—only to receive an unrelated, perfectly timed, conveniently anonymous tip that magically created probable cause out of thin air? Or—(B) That when the first complaint died, the government invented a new one, suppressed the original, and pretended the second was organic? The language betrays the truth: the original complaint focused exclusively on septic systems, while the second conjured complaint focused on structures. They do not share DNA. They share instinct— an instinct to fabricate cause when cause did not exist. This is selective and vindictive prosecution, disguised as routine enforcement. Probable Cause Turned Upside Down In law, probable cause precedes investigation, not the other way around.  Yet here, the violation determination preceded any inquiry. Garcia pre-committed to the conclusion, ignored exculpatory evidence, and shaped the facts to fit a predetermined narrative. This is a textbook violation of procedural due process.

19. Sixthly, The Photographic Evidence That Collapses the Case. Officer Garcia's approved Compliance Notice spans four pages: Page 1: narrative, allegations, deadlines; Pages 2–3:"photographic documentation"; Page 4: conclusion of violation Yet Page 1 claims he photographed 1035 Olive Ave, while Page 2—supposedly documenting the violation—lists the address as 1011 Olive Ave. In one fell swoop, the Notice collapses under its own weight. A document that cannot identify the correct property cannot form the foundation of lawful enforcement. Such sloppiness is not merely embarrassing— save for a violation against Defendants — Officer Garcia ineffectiveness renders the entire Notice unreliable, defective, useless, and incapable of supporting any violation whatsoever. Officer Garcia did not follow evidence. He manufactured it. He did not investigate a violation. He invented one. He did not apply the law. He abandoned it. The case he built is not a structure. It is a golem—an unformed, fictional statue brought to life through imagination rather than fact—and like all false constructs, it crumbles the moment the light is turned on.



-19-

**County of San Diego, Planning & Development Services Code Compliance Division**
**Compliance Notice**

**Documentation**

Oct 15, 2025 at 11:13:18 AM
1011 Olive Ave
Ramona CA 92065
United States

**It has long been clearly established that officials may not fabricate or knowingly rely upon false information to initiate enforcement or criminal investigation, nor may they ignore exculpatory evidence while pursuing enforcement action.**

20. October 16, 2025 – Officer Garcia's Rush to Judgment. On October 16, 2025, Officer Israel Garcia, in a haste unbecoming of his office, officially issued the Planning and Developmental Services Compliance Notice—a document riddled with irreconcilable logical fractures and crevassed with contradictions. In his rush to judgment, Officer Garcia (and by extension the County of San Diego) committed a succession of errors so profound that the Notice collapses under its own weight before it can even stand. Suppression of the Original Complaint. Defendants—either Officer Garcia or the County— suppressed the specific details of the original complaint submitted by Victor Smith, the only complaint that ever purported to supply probable cause. This complaint was: never provided to the Plaintiffs, never disclosed in substance, never used as the basis for the alleged ADU violation, and ultimately butchered beyond recognition. The County concealed the very facts that would have revealed the poverty of its cause. When the County abandoned Smith's septic allegations and forged a new narrative around a "structure," it severed the chain of probable cause. Probable cause cannot mutate; it must be proven.

A Compliance Notice Built on Befuddlement. Officer Garcia's Compliance Notice reveals a bewildering level of confusion—so great that it becomes impossible to discern where his error began. At best, his confusion emerged at the final stage—when he affixed photographs of the wrong property to a Notice alleging a violation at 1035 Olive Ave while the photographs announced 1011 Olive Ave. At worst, however, the confusion began at the inception of his investigation—Garcia perhaps never understood the correct property at all, conflating one address with another from the very first stroke of his pen. The result is an administrative labyrinth: a Notice in which the foundational "documented evidence" is linked not to the Plaintiff's property, but to an entirely different location. This is not merely sloppy. It is legally fatal. No enforcement can proceed when the government cannot identify the place it claims to regulate. Here, The Government and Defendant Puts the Cart Before the Horse.

21. On October 10, the same day a mysterious second "anonymous complaint" appeared, Officer Garcia (or the County) had already pre-determined a violation. Five days later, on October 15, he conducted an "investigation" not to determine whether a violation existed, but simply to confirm that the structure he already accused still physically existed. This is the antithesis of procedural fairness: the violation came first; the inspection came second. Such inversion is a constitutional defect. Due process cannot exist when the outcome predates the inquiry. The Failure to Consider Exculpatory Evidence.

22. When researching the property, Defendants: ignored appraisal history showing the structure existed since 2001, ignored county documents labeling it a utility shed, ignored all evidence contradicting the ADU narrative, and elevated non-facts as if they were evidence. This is the very definition of selective enforcement and willful blindness—both violations of procedural due process.

23. October 22, 2025 – "Let me just close the case…" On October 22, Plaintiff King Cohen and Officer Garcia held a conference call. During that call, King Cohen read aloud the precise ordinance Garcia cited: SDCCRO §§ 91.1.105(a), 91.1.111.1, 91.1.114.1; This was not interpretation. This was not debate. It was the plain text of the law.

**Violation #1**:

**SDCCRO Section 91.1.105a, 91.1.114.1, 91.1.111.1. - Permits Required**

No person shall erect, construct, enlarge, alter, repair, maintain, move, improve, remove, convert or demolish a building or structure regulated by this chapter without a separate permit for each building or structure, issued by the building official. This section shall not be construed to require separate permits for a dwelling and auxiliary buildings or structures on the same property which are described in a building permit application, plot plan and other drawings.

24. Garcia verbally acknowledged that the text was read correctly. Then Cohen read the final sentence—the exception: "This section shall not be construed to require separate permits for a dwelling and auxiliary buildings or structures on the same property which are described in a building permit application, plot plan, and other drawings." Garcia again acknowledged: the exception was correct, the Plaintiffs met the exception, and no permit was necessarily required if the documents existed. When informed that Plaintiffs had the documents in hand, Garcia agreed the case would be closed upon receipt. Plaintiffs sent the documents immediately.

25. The Documents That Ended the Case. Plaintiffs provided:



Plot Plan

**Permit Application**



Permit Application



Permit Application





26. After receiving these documents, Garcia quietly abandoned the term "ADU" and began referring to the structure as the "utility room"—an implicit admission that the Plaintiffs had satisfied the law and that his prior allegation was unsustainable. Under the County's own interpretation, the evidentiary standard was fully met.

27. Due Process Warnings and Qualified Immunity. During the call, King Cohen warned Officer Garcia: Qualified immunity evaporates when officers knowingly violate constitutional rights. Misstating the law, ignoring the law, or inventing the law strips an officer of protection. Continuing enforcement after exculpatory evidence is presented is knowing and willful misconduct. Garcia dismissed these warnings with a wave, saying only "This is the due process." But due process cannot exist when: the investigation ends before it begins, evidence is suppressed, exculpatory documents are ignored, the wrong property is photographed, and the County predetermines guilt before inquiry. This is not due process. It is punitive bureaucracy masquerading as lawful authority. Garcia then stated he needed to "ask his boss" whether the documents could be accepted—a remarkable admission, given that the law itself requires no such discretion. Government officials must enforce the law as written, not as reimagined, reinvented, or repurposed. By October 22, the County had everything it needed to close the matter—everything its own ordinance requires. Yet instead of closing the case, Officer Garcia kept opened a fiction, a violation that had already died. Such conduct is not protected. It is willful, knowing, and unreasonable, and it falls squarely outside the shield of qualified immunity. This is not compliance. This is constitutional malpractice.

28. Between October 23, 2025 and November 24, 2025, Officer Israel Garcia and Heather Cohen held a series of recorded conference calls. Despite previously acknowledging that Plaintiffs had met the evidentiary requirements under the ordinance, Officer Garcia abruptly shifted course. He refused to accept the "other drawings" he had earlier agreed were sufficient, now insisting—without citing any legal authority—that the drawings required certain unspecified and newly invented "qualifiers." It was a retreat not grounded in law, but in expedience. November 24, 2025 – The Interview That Revealed Everything. On November 24, 2025, Heather Cohen spoke with Officer Garcia again—this time in a telephone conference call. What followed was a sequence of admissions that illuminate the heart of the County's misconduct.

i.   Officer Garcia stated plainly: "I have reviewed and approved the complaint."

ii.  Plaintiff Heather Cohen: "You filed the report, correct?"

iii. Defendant Officer Garcia: "Yes. I made my observations and that's what I found."

iv.  Plaintiff Heather Cohen: "Is it all true?"

v.   Officer Garcia: "Yes."

vi.  Plaintiff Heather Cohen: "Did you omit any facts or change any meanings?"

vii. Officer Garcia: "It's exactly what's online."

viii. Sensing the evasiveness, Plaintiff pressed further: Plaintiff Heather Cohen: "Did you omit facts or change meanings to fit your own qualified meaning or understanding?"

ix.  Officer Garcia: "I'm not understanding the question?"

x.   She repeated it: Plaintiff Heather Cohen: "Did you omit facts or change meanings to fit your own qualified meaning or understanding?" Pinned, Garcia finally answered: Officer Garcia: "No."

-29-

xi. Heather Cohen then moved to the crucial cornerstone of administrative responsibility: Plaintiff Heather Cohen: "Did you review and approve this document?"

xii. Officer Garcia: "Yes."

xiii. In the space of a single conversation, Officer Garcia: confirmed authorship of the report, affirmed the truth of every statement contained therein, denied omissions, alterations, or reinterpretations, and admitted he personally reviewed and approved the document. These admissions form a fixed point in the record—a place where the Defendants' narrative cannot shift without descending into contradiction. By affirming full authorship and accuracy, Garcia tethered himself irrevocably to the Compliance Notice—including its defects, misstatements, false premises, incorrect address, and its reliance on fabricated probable cause. He cannot disavow it. He cannot distance himself from it. He cannot claim misunderstanding. His own words bind him. This interview becomes yet another moment where the County's procedural façade cracks—revealing, beneath it, a pattern of suppression of exculpatory evidence, refusal to acknowledge established law, shifting standards, post hoc rationalizations, and a continued insistence on enforcement even after the legal requirements had been fully satisfied. It is in this moment that the administrative theater collapses, and the constitutional violations step forward in plain view.

xiv. Officer Garcia Explains the Process — and Unwittingly Confirms the Plaintiffs' Case. Between October 23, 2025 and November 4, 2025, Officer Israel Garcia and Heather Cohen engaged in further conference calls.

During these conversations, Garcia revealed a shifting, improvisational understanding of both the law and the evidence—an understanding that mutated each time Plaintiffs supplied clarifying facts. By this stage, Garcia's earlier willingness to accept the "other drawings" had evaporated. He now refused them outright, insisting—without textual support—that the drawings required certain unspecified "qualifiers" found nowhere in the ordinance. It was yet another invention added to the growing list of novel requirements Garcia imposed upon the Plaintiffs. The Conversation Begins: Plaintiffs Identify the "Evidence". Plaintiff Heather Cohen: "We'd like to ask you a few questions. This is the evidence you collected: a so-called anonymous complaint, a supposed 370-square-foot ADU, possible electricity, and a silver Chevy. Correct?"

xv. Defendant Officer Garcia: "Look, the way it works—'someone' reported it. 'Someone' saw something and said there's a good chance the structure is not permitted. So when we receive a complaint, that's what we go based on. We get an intake. After that we investigate by doing a little digging. We run the APU to see if there are any permits or potential plot checks. If no evidence of permits or potential plot checks, then we inspect to make sure the structure still remains. We take photos of our impressions. When I got it, I looked it up. It was the only structure I could find. I looked up everything else I know about all the things added to the building plan. But there is no permit. That's where it gets sticky—we don't have proof it was permitted."

xvi. In this explanation, Garcia inadvertently reveals the entire defect in the County's case: He begins with "someone"—later admitted to be Victor Smith.

He acknowledges that Smith reported only septic concerns, yet Garcia later claimed the issue was structural. He uses no evidence to justify enforcement. He equates absence of evidence with evidence of violation. He makes no effort to examine whether the property falls under the statutory exception. Garcia confirms that the entire "investigation" consisted of: receiving a complaint, running a record search, confirming the structure physically exists, photographing his impressions. Nothing in this process satisfies the constitutional requirement of probable cause, nor the ordinance's requirement of legal analysis. Garcia merely confirmed his own bias, not any violation.

xvii. Garcia Misstates and Rewrites the Statute. Heather Cohen then read the governing clause back to him: SDCCRO Exception Clause. "This section shall not be construed to require separate permits for a dwelling and auxiliary building or structures on the same property which are described in a building permit application, plot plan, and other drawings. Does the law say that?"

xviii. Officer Garcia: "No. So what that means is if it's on a set of approved plans."

xix. Heather intercepted the misstatement instantly: Plaintiff Heather Cohen: "Hold on. Not so fast. I'm going to read you the law. It says specifically: 'This section shall not be construed to require separate permits... described in a building permit application, plot plan, and other drawings.' Nowhere does it say these must be 'approved plans.' The statute contains no qualifying language restricting 'other drawings' to a particular form or certification. 'Other drawings' were provided to you from 2025 and from 2001. You are adding language to the statute that does not exist."

-32-

xx.   Garcia attempted a retreat: Officer Garcia: "No, a building inspector or someone came out to inspect the pool. Normally they include everything on the inspection sheet. When they see it, the structure is only an observation, not a permit."

xxi.   But Heather pierced the fallacy: Plaintiff Heather Cohen: "That is not what is written. Even if you were not misstating the law, the structure has been there since the early 2000s. It is characterized as a utility shed, predating ADU laws entirely. And even if it did not, what you claim the law 'means' is irrelevant. What the law says governs."

xxii.   Still, Garcia persisted: Officer Garcia: "Ya, but you have to include a separate set of plans."

xxiii.   Heather, again, corrected him: Heather Cohen: "It does not say that. It says: '…described in a building permit application, plot plan, and other drawings.' The law is directly contrary to what you're saying."

xxiv.   Unable to reconcile his interpretation with the statute, Garcia offered a shifting criterion: Officer Garcia: "If it gets approved it needs a scope of work. We don't have a scope of work."

xxv.   Heather responded: Heather Cohen: "The law does not say that. The law says the exception applies when the auxiliary structure appears in the building permit application, the plot plan, and other drawings. And we fall squarely within that exception."

xxvi.   Garcia tried once more: Officer Garcia: "No scope, no plans, no permit. Nothing is on record. The photos you submitted are only for septic and nothing else."

xxvii.   Heather responded one final time—directly quoting the law whose meaning Garcia continued to reject: Heather Cohen: "The law says: 'This section shall not

-33-

be construed to require separate permits… described in a building permit application, plot plan, and other drawings.'"

xxviii. Officer Garcia's Pattern of Misconstruction Error And Confusion. Here, Garcia demonstrated: confusion about the original complaint, confusion about the statute, confusion about the evidentiary standard, confusion about the meaning of "other drawings," confusion about the timeline of the structure, and confusion about the difference between "observation" and "permit." His reasoning is not merely flawed—it is circular, contradictory, and irreconcilable with the law he is charged to enforce. His errors include, inventing legal requirements the statute does not contain, ignoring the exception clause confusing necessary conditions with sufficient conditions, rejecting evidence that meets the required standard, and misstating the scope of documentary proof.

xxix. The law requires a structure to appear in: the building permit application, the plot plan, and other drawings. This is a conjunctive requirement, and Plaintiffs satisfy all three.

xxx. Garcia eventually conceded on October 22, 2025 and November 24, 2025 the structure is on the plot plan. Garcia eventually conceded on October 22, 2025 and November 24, 2025 The structure appears on a previous permit application (2025 septic application). Garcia eventually conceded on October 22, 2025 and November 24, 2025 the structure appears on a previous permit application (2025 pool application). Garcia eventually conceded on October 22, 2025 and November 24, 2025 the structure appears on "other drawings" (pool inspector drawings). Garcia concessions satisfy the entire exception clause, proving no permit is required, and eliminating any possible violation.

xxxi.    Officer Garcia Assumes Facts Not in Evidence — and Cannot Identify a Single Element of an ADU. In the course of the November 24 conversation, Officer Israel Garcia revealed not merely confusion, but a startling absence of factual basis for his conclusions. When confronted with the simplest and most foundational question, the illusion collapsed. Plaintiff Heather Cohen: "Can you identify one element of an ADU structure?"

xxxii.    Officer Israel Garcia: "Yes — needs a permit, a valid utility permit, if it's over 120 square feet. I didn't even get a chance to measure it." With this admission, Garcia simultaneously affirmed two irreconcilable positions: He had never measured the structure. He nonetheless conjured a precise figure of 370 square feet. This contradiction is not subtle; it is catastrophic. It reveals that the number "370" was not derived from measurement, inspection, or any accepted investigative method, but from assumptions, presumptions, and the bureaucratic equivalent of imaginative fiction. When asked what transforms a utility shed into an ADU, Garcia offered nothing resembling elements, criteria, or statutory requirements. Instead, like a novice magician fumbling through a trick, he produced a circular argument that, distilled to its essence, was simply: "Because I said so."

xxxiii.    Officer Garcia Oversteps His Authority — and Invents New Ones Plaintiff Heather Cohen: "You are not welcome to come on our property easement. This easement is protected. We decide who may enter. You claim to have the same freedom as Amazon, but Amazon brings goods — you are attempting to take property away. Any further action requires a warrant."

-35-

xxxiv.  Officer Garcia: "The easement you all share is open to the public. It's private, privately maintained. We still have access. But now that you're saying that, that's fine." Heather pressed further: Plaintiff Heather Cohen: "You claim you took photos from a 'public road,' but it was a private road. Were you invited on by any of the other easement owners?"

xxxv.  Officer Garcia: "So… pretty much I have probable cause."

xxxvi.  Plaintiff Heather Cohen: "What was your probable cause?"

xxxvii.  Officer Garcia: "The structure." Here, Garcia abandons the original basis of alleged probable cause Victor Smith's complaint of an unpermitted septic system on October 10, 2025 —and substitutes a new one, inconsistent with the original complaint, the law, and the facts.

xxxviii.  Heather pressed again: Plaintiff: "What was your probable cause?"

xxxix.  Garcia: "The structure."

xl.  Plaintiff: "Do you mean the October 10th complaint about the building violation?"

xli.  Garcia: "Correct."

xlii.  Plaintiff: "But on the same day you declared it in violation?"

xliii.  Garcia: "Yes, correct."

xliv.  Plaintiff: "Before completing your investigation? You didn't inspect until five days later."

xlv.  Garcia: "I looked at building records."

xlvi.  Plaintiff: "No evidence cannot be used as evidence. You said yourself you found no evidence."

-36-

xlvii.  Officer Garcia Rejects Exculpatory Evidence — and Admits He Possesses It, Garcia then attempted to reverse the burden of proof. Officer Garcia: "What makes you think the building doesn't need a permit?" Plaintiff Heather Cohen: "I gave you the documentation on October 22, 2025." Garcia conceded: Officer Garcia: "Yes, I have them here."

xlviii.  Plaintiff: "So you admit you have the drawings?"

xlix.  Garcia: "For a pool, correct? Says Planning and Development Pool Check. I do see that your husband sent it."

l.  Heather clarified: Plaintiff: "No — it is not a pool plan. It is from May 3, 2001. The drawings are on the back. They originate from the Department of Environmental Health. Septic authorization. Do you admit you have this?"

li.  Garcia: "Correct, for the septic."

lii.  Heather drew the line clearly: Plaintiff: "This is 'other drawings.' You received them, correct?"

liii.  (Garcia laughed) Officer Garcia: "This is not…"

liv.  Plaintiff: "Is this an 'other drawing' or not?"

lv.  Garcia: "It's a drawing… but for a septic layout."

lvi.  Plaintiff: "And you received it, correct?"

lvii.  Garcia: "For a septic layout, correct."

lviii.  Heather then delivered the unavoidable conclusion: Plaintiff: "The law does not say 'other drawings' exclude septic layouts. It says plainly: '…described in a building permit application, plot plan, and other drawings.' You received these. You acknowledged them. You saw them. There is no violation and therefore no correction to be made."

lix. At this point, Garcia retreated: Officer Garcia: "Heather, I'm going to let you go — I have another meeting." (Hangs up.)

**Bourke fabricated a Report Knowing Agencies Would Rely.**

29. Defendant Marion Joyce Bourke is the step-daughter of Defendant Smith.

30. Defendant Marion Joyce Bourke is the step-sister of Brittnay Smith.

31. Brittnay Smith's daughter is Brooklynn Pasquotto.

32. In or about November 2025, Defendant Bourke falsely attributed the origin of a federal SSI-related report to Plaintiff Heather Cohen, despite knowing that Plaintiff had no involvement in authoring or initiating such a report.

33. Defendant Bourke's false allegations made in her SSI reporting was designed to negatively impact Defendant Bourke's sister Brittnay Smith, Brooklynn Pasquotto and Heather Cohen.

34. On or about November 9, 2025, Brittnay Smith became aware she was under investigation for SSI fraud.

> Well either way now I'm being investigated

35. On November 9, 2025, Victor Smith's daughters, Brittney Smith and Marion Joyce Bourke, were in communication via text message regarding two separate matters.

36. First, Brittney Smith confronted Marion Joyce Bourke about using Brittney Smith's daughter to watch Marion Joyce Bourke's children while Marion Joyce Bourke engaged in sexually promiscuous conduct. Brittney Smith stated: "The situation I'm talking about is having sex with whoever while B (Brooklyn) is watching your kids and she can hear what was happening."



37. Second, the parties discussed the authorship of a false report that resulted in Brittney Smith being placed under investigation by SSI for fraud. During this exchange, Marion Joyce Bourke suggested that Heather Cohen was responsible for initiating the investigation. Marion Joyce Bourke wrote: "Hi Brittany, I just wanted to reach out because I'm surprised and saddened you think I would report you for anything. I'm sorry you're going through this right now, but Papa picked a fight with the wrong people. Unfortunately, I am worried about them because their neighbor plans to sue them. The wife did reach out to me asking personal questions and was a little too focused on B (Brooklyn). I'm going to send a link I think you should read. These people sued over 100 people. They have also changed their name like six times and they're younger than me."





38. Defendant Bourke falsely blamed Heather Cohen for the SSI investigation launched against Brittnay Smith.

39. Defendant Bourke made false and defamatory statements about Heather Cohen to Brittnay Smith calling Heather Cohen "crazy" or "CRAZY".

 

40. Defendant Bourke claimed that she spoke with Heather Cohen on or about November 9, 2025 but this is not true. Defendant Bourke spoke with Heather Cohen only once

I'm not friends with her whatsoever but now she's upset and feels harassed by papa. This bitch called me out of nowhere.

and it was when Defendant Bourke cold called Heather Cohen claiming to have exculpatory evidence (email from John Levya to Victor Smith) for Heather Cohen and King Cohen's case Victor Smith had started with the city October 10, 2025.



41. Defendant Bourke made false and defamatory statements about Heather Cohen to Brittnay Smith calling Heather Cohen a "bitch".

42. Defendant Bourke made false and defamatory statements about Heather Cohen to Brittnay Smith claiming Heather Cohen "is always strung out on adderal".



43. Defendant Bourke made false and defamatory statements about King Cohen to Brittnay Smith claiming he is "nuts" and "capable of murder".

-41-



44. On or about November 24, 2025, Heather Cohen was contacted by Victor Smith's daughter, Marion Joyce Bourke, who informed Heather Cohen of Victor Smith's hatred toward her family.



45. Marion Joyce Bourke stated that it was Victor Smith who had initiated the city investigation. As proof, Marion Joyce Bourke provided the October 10, 2025 email exchange between Victor Smith and John Leyva of the County of San Diego Code Compliance Division. During the course of the phone call, Marion Joyce Bourke attempted to manipulate Heather Cohen into initiating civil litigation against Victor Smith.



iMessage
Mon, Nov 24 at 11:34 AM

Hey send me that email please. ANYTHING you have of messages and conversations to show he's reporting everyone. We can all use this to show its retaliation and I'll gladly draw the suit

This is all my mother sen me when she looked thru his phone but he's been taking photos of Melanie's property an reported her for animal abuse/neglect.

Do you have the send message from Victor saying what he said



5 Photos Saved

This is Melanie's yard. He was creeping around snapping photos.

Wow that's creepy do you have any of ours??

I don't think he took any photos of your house but he's a fucken creep so you never know. He's for sure jealous of your house and pool though. He wants the county to make you rip it up.

Lmao the pool is 100% city approved we passed every single inspection with flying colors

Lmao the pool is 100% city approved we passed every single inspection with flying colors

He wants you to fight with Mel and me to fight with Mel. He legit told my mother than Mel was talking about me being a bad mother. Saying I leave my kids in the car for hours without ventilation. He's so jealous, I've never met anyone like him and he should be sued for his actions.

His own daughter is a piece of shit. She dumped her kids onto my mother 16 years ago.

His oldest daughter is a loser and has been ripping off SSN & Food stamps for like 16 years now. Victor

His oldest daughter is a loser and has been ripping off SSN & Food stamps for like 16 years now. Victor needs to focus on his own kids and worry about himself.

His other daughter named Ashley is LITERALLY a toothless crack whore wandering the streets of Phoenix. She's been that way for 20 years now.

Yea I don't understand why he's so upset we have never been cruel to him but it's fine I don't have time for this with him. It will be fine and it will be taken care of.

Yea I don't understand why he's so upset we have never been cruel to him but it's fine I don't have time for this with him. It will be fine and it will be taken care of.

He's just jealous and gets satisfaction out of watching others suffer. Especially if he can cause the demise. He's the biggest liar I've ever met. Nice to your face, but wants to destroy you behind your back.

He literally had NO BUSINESS trying to get you in trouble with county code.



+    iMessage

He literally had NO BUSINESS trying to get you in trouble with county code. He can't even see your house from his. He just gets jealous especially when young people are successful. His daughter couldn't even take care of 2 children and you're doing great with all yours.

I really appreciate that. It's really sad he's so upset with everyone around him like this. It's the holidays and he's so upset with everyone you'd think he'd want to be kind to everyone close to him. Do you think you might have a copy of the email that he sent them when he reported everything

I really appreciate that. It's really sad he's so upset with everyone around him like this. It's the holidays and he's so upset with everyone you'd think he'd want to be kind to everyone close to him. Do you think you might have a copy of the email that he sent them when he reported everything

Oh no. He's ALWAYS been a very jealous person and the biggest liar. He's a narcissist and absolutely LOVES to cause harm. Probably because his own children are losers.

Do you know that he raised his grandchildren because his daughter claimed she had post partum

Do you know that he raised his grandchildren because his daughter claimed she had post partum depression? You can't have PPD for 16 years. She just dumped her kids and partied on in a whole different state.

Brittany was collecting state benefits for her kids and not sending anything for them. She's a loser and he knows it.

Ugh that's so sad. My mother was a prostitute and an addict for most of my life and I know how hard that life is as a child.

Delivered

I'm so sorry to hear that, I don't know you whatsoever really but you seem to be



46. On or about November 30, 2025, Brittney Smith, the actual subject of the SSI investigation, contacted Plaintiff Heather Cohen and informed her that an investigation had been initiated and that Bourke had represented that Plaintiff was responsible.



47. Plaintiff Heather Cohen denied authoring or initiating any such report and provided corroborating evidence showing no contact or communication supporting Bourke's attribution.



-44-

48. Brittney Smith subsequently sent Heather Cohen screenshots of messages exchanged between Marion Joyce Bourke and herself, in which Marion Joyce Bourke made defamatory statements about Heather Cohen.



49. On December 1, 2025, Marion Joyce Bourke confessed to Melanie Garcia that she had authored a false SSI report against Brittney Smith via Facebook and had falsely blamed Heather Cohen for the report. Marion Joyce Bourke stated: "Ugh girl, I totally fucked up. I reported Victor's daughter for SSI fraud and now she's suing me. I submitted the report anonymously and I totally blamed Heather. I was like… 'It was probably the neighbor who reported you. She's crazy and sues everyone.' Brittany straight up confronted Heather about what I texted, and they know it was me. I'm sorry for all my actions. I did retract my report on Brittany, and the drug addict thing? It was a mistake. I've just been getting a lot of poor treatment because of me cheating, and the way Brittany approached me was harsh. I'm sorry I even involved you and Heather. I totally regret it with all my heart. <3 The biggest mistake I've made in a very long time, and I'm beating myself up about it right now."



50. This admission constitutes a direct acknowledgment of false reporting and the intentional attribution of that report to Heather Cohen.

51. On December 1, 2025, Marion Joyce Bourke confessed directly to Brittney Smith that she was the true author of the false report. Marion Joyce Bourke stated: "Hi Brittany, I wanted to reach out and apologize for what I did. It was extreme, and I can't believe I betrayed you like that. I've just been feeling attacked by everyone because of the cheating thing, and I'm ashamed of that too. I can't believe I let it happen. I also apologize to Heather for trying to blame her. I was a coward when I got caught, and honestly, I felt regret the moment I did it. I sent a full retraction in your defense, and I'm sorry for taking your approach toward me so poorly. In due time, I'd like to put this behind us and function like a family unit."

52. This statement constitutes a direct admission of authorship of the false report, acknowledgment of the attempted deflection of blame onto Heather Cohen, and confirmation that a retraction was submitted.

53. On or about On December 1, 2025, Marion Joyce Bourke confessed directly to Heather Cohen that she was the true author of the false report. Marion Joyce Bourke stated: "Hi Heather, I just wanted to reach out and apologize for trying to blame you for the report. When I got [sic] caught, I was a coward and tried to blame you. I'm so sorry I did that. Things got out of hand, and I started to panic. The drama is all my fault, and I hope you don't hold any resentment against me eventually. I've never even met you, and I'm so ashamed I did this."

Mon, Dec 1 at 10:24 AM

Hi Heather, I just wanted to reach out & apologize for trying to blame you for the report. When I go caught, I was a coward and tried to blame you. I'm so sorry I did that 🙀

Things got out of hand and I started to panic. The drama is all my fault & I hope you don't hold any resentment against me eventually. I've never even met you and I'm so ashamed I did this.

54. This statement constitutes a direct admission of authorship of the false report and acknowledgment of the intentional attempt to falsely attribute that report to Heather Cohen.

55. On December 1, 2025, Marion Joyce Bourke confessed directly to SSI that she was the true author of the false report. Marion Joyce Bourke stated: "To Whom It May Concern, I am writing to formally retract a fraud report I previously submitted regarding my sister, Brittney Smith. The report was made during a personal dispute, and I deeply regret that I allowed our conflict to influence my actions. I want to clarify that the report was made in error and was not based on accurate or factual information. I take full responsibility for this mistake and sincerely apologize for any inconvenience or confusion it may have caused. Please disregard the previous complaint in its entirety. If any additional information is needed from me to correct this matter, I am willing to cooperate fully."

> ← 👤 Joy Princess    📞 📹
>
> To Whom It May Concern,
>
> I am writing to formally retract a fraud report I previously submitted regarding my sister, Brittany Smith. The report was made during a personal dispute, and I deeply regret that I allowed our conflict to influence my actions.
>
> I want to clarify that my report was made in error and was not based on accurate or factual information. I take full responsibility for this mistake and sincerely apologize for any inconvenience or confusion it may have caused.
>
> Please disregard the previous complaint in its entirety. If any additional information is needed from me to correct this matter, I am willing to cooperate fully.

56. This written retraction constitutes a formal admission of authorship, acknowledgment that the report lacked factual basis, and a complete withdrawal of the false complaint

57. Defendant Bourke further acknowledged her conduct to third parties and provided documentary evidence confirming her responsibility for the false report.

58. Defendant Bourke's false attribution foreseeably caused governmental scrutiny, investigation, and reputational harm to Plaintiff Heather Cohen and was relied upon by agencies acting under color of law.

**Escalation, Threats, and Law Enforcement Inaction**

59. Following the initiation of enforcement actions and false reports, Defendant Smith escalated his conduct toward Plaintiffs.

60. On or about January 6, 2026, Defendant Smith entered Plaintiffs' driveway easement with a pitbull without permission and issued verbal threats toward neighboring residents Denis and Maleniee Garcia.

61. On or about January 6, 2026, Denis Garcia, Maleniee Garcia, King Cohen, and Heather Cohen sent  Defendant Smith was sent a Cease and Desist Notice With Offer to Resolve:

# "CEASE AND DESIST NOTICE WITH OFFER TO RESOLVE

Dear Victor Smith:

This correspondence serves as formal notice that your wrong and outrageous conduct toward me and my household constitutes nothing less than harassment, trespass, and the creation of a public nuisance, and that such conduct must cease immediately.

"I am the punishment of God. If you had not committed such great sins, God would not have sent a punishment like me upon you."

Thus, consequences do not arise without cause and this statement is not a threat. Moreover this statement is a serious an sagacious reminder that persistent misconduct summons its own consequences, as surely as day follows night. Further, it has been observed, recorded, and documented that you have engaged in repeated acts including, but not limited to:

Entering or remaining upon my property without consent. Unwanted contact and harassment interfering with the quiet enjoyment of my home. Conduct that disturbs the peace, safety, and well-being of residents and the surrounding community. You are hereby placed on notice that no permission, license, or consent—express or implied—exists for you to enter my property, approach me, or interfere with my household in any manner save for settlement negotiations or litigation

-50-

DEMAND TO CEASE AND DESIST

You are hereby directed to immediately cease and desist from the following:

1. Entering or approaching my property for any reason

2. Communicating with me directly or indirectly, except for settlement negotiations or litigation

3. Engaging in harassment, intimidation, or interference

4. Creating or maintaining any condition constituting a public nuisance

You are now on notice, therefore take heed that correction remains possible.

OFFER TO RESOLVE (GOOD-FAITH SETTLEMENT COMMUNICATION)

Without admitting any obligation and solely in the interest of avoiding litigation, I am willing to resolve this matter amicably under the following conditions:

1. Immediate and permanent cessation of all trespass, harassment, and nuisance activity

2. Written assurance that you will not enter my property or contact me again

3. No retaliation or indirect interference through third parties

4. Compliance beginning immediately and continuing without exception

If these conditions are met with in 24 hours, I am prepared to forbear initiating a lengthy legal action related to the conduct described above. This offer is made in good faith, pursuant to applicable court rules governing compromise negotiations, and is inadmissible for any purpose other than settlement.

NOTICE OF CONSEQUENCES

Again, If after 24 hours you fail to comply with this notice or reject this opportunity to resolve the matter, I will swiftly, zealously, and faithfully pursue the full spectrum of legal remedies available at law and in equity, including but not limited to:

Law enforcement involvement.

Civil claims for trespass, harassment, and nuisance.

Requests for restraining or protective orders.

Recovery of damages, costs, and attorney's fees where permitted.

Nothing in this letter shall be construed as a waiver of any rights or remedies, all of which are expressly reserved.

Govern yourself accordingly.

Sincerely,

King Cohen, Heather Cohen, Maleniee Garcia, Dennis Garcia"

62. On or about January 6, 2026, Victor Smith replied that he will not comply and cease and desist his behavior:

> The sheriff will be there to get the felon out of the undocumented dwelling that you told the neighbors is in there Heather, so you might want to talk to Melanie's about that as far as everything else, do what you think you need to do cause, I'm not complying, so good luck. nice, AI generated form. Bring it on

63. On or about January 7, 2026, the autistic child of Heather Cohen and King Cohen eloped from their residence at 1035 Olive Ave. Heather Cohen immediately contacted emergency services for assistance. Heather Cohen located their child approximately four houses away, at the beginning of Olive Ave. She then remained on scene and waited for law enforcement to arrive. Responding law enforcement officers conducted a field investigation and determined that there was no wrongdoing or negligence. Officers advised Heather Cohen that she appeared to be a good mother and encouraged her not to be overly self-critical, explaining that elopement incidents commonly occur with special-needs children.

64. Later that same day, Heather Cohen approached Victor Smith solely to thank him in the event that he had assisted during the search. Victor Smith redirected the conversation to express frustration regarding the previously issued cease-and-desist letter. Smith then voiced grievances about alleged permit violations involving other neighbors—matters over which Heather Cohen and King Cohen have no control.

65. When Heather Cohen informed Smith that those issues did not involve her or King Cohen, Smith continued by asserting a false theory that Melonee Garcia, Denise Garcia, King Cohen, and Heather Cohen were operating a business together to build and rent an accessory dwelling unit. Heather Cohen expressly denied this claim and informed Smith that no such business relationship had ever existed. Despite this clarification, Victor Smith insisted that he possessed text messages to support his theory and threatened to "destroy" the alleged business. Smith further escalated the encounter by threatening to involve Child Protective Services, stating that Heather Cohen was "lucky someone doesn't call Child Protective Services."

66. Heather Cohen and Victor Smith Transcript (January 7, 2025):

lx.    **Victor Smith:** If you want to go to court, let's go!

lxi.    **Heather Cohen:** Victor, I just came here to say thank you for helping look for my son. It's not about..

lxii.    **Victor Smith:** Your more, than welcome, and I told King, thank God!

lxiii.    **Heather Cohen:** It's not about my home, it's not about the property, don't threaten my child, don't say anything, I'm just trying to be nice.

lxiv.    **Victor Smith:** I'm not threatening anyone, what are you talking about?

lxv.    **Victor Smith:** I didn't threaten your child I didn't threaten anybody.

lxvi.    **Heather Cohen:** Your talking about CPS and stuff.

lxvii.    **Victor Smith:** I said, "Your lucky 'SOMEBODY' didn't"…

lxviii.    **Heather Cohen:** I reported myself. My kid ran out of the house when I was changing another kids diaper. He runs he will strip off all his clothes and run full on.

lxix.    **Victor Smith:** I know, I know, what that's like.

lxx.    **Heather Cohen:** That's autism, you don't know. I live it every day. He doesn't speak. He doesn't eat food, do you understand? He doesn't drink water.

lxxi.    **Victor Smith:** I'm not going to argue with you.

*(Victor Smith's granddaughter looks through the blinds to see who her grandfather is talking to. Heather notices, raising here hand chest high to politely wave hello)*

lxxii.    **Heather Cohen:** Hi I'm Heather, nice to meet you.

lxxiii.    **Victor Smith:** I'm not going to argue with you.

lxxiv.    **Heather Cohen:** I'm not an argumentative person..

lxxv.    **Victor Smith:** Well, your doing it right now.

-54-

lxxvi.  **Heather Cohen:** No, I came to say thank you, you come out talking about property and pictures. I said, "hey, I just want to say thank you for looking for my son."

lxxvii.  **Victor Smith:** But, here is the problem, "*DING* (Heather Cohen) and *DONG* (Malene Garcia)" You guys talk..but I got news for ya. their in for some…. "*Good Stuff.*"

lxxviii.  **Heather Cohen:** Trust me, I'm watching (Malene Garcia and Denise Garcia). I see. I know what they (Malene Garcia and Denise Garcia) are doing. That (Malene Garcia and Denise Garcia's house) ain't my house though…

lxxix.  **Victor Smith:** Ok, well..

lxxx.  **Heather Cohen:** I told them, your going to get in trouble. Just like they did down there. You got'a get permits.

lxxxi.  **Victor Smith:** Ok, so your going to send a *letter* saying, "I'm not doing *nothing*"…

lxxxii.  **Heather Cohen:** This isn't about that.. Stay on topic.

lxxxiii.  **Victor Smith:** No, I just got it last night.

lxxxiv.  **Heather Cohen:** Stay on t…

lxxxv.  **Victor Smith:** You think I'm going to just drop.. just like that. When you *FUCK'N* threaten me like that? You threaten the wrong *dude*..

lxxxvi.  **Heather Cohen:** Dude, you threatened us.. you do all the time..

lxxxvii.  **Victor Smith:** What are you talking about?!?

lxxxviii.  **Heather Cohen:** *"You own this road"*

lxxxix.  **Victor Smith:** I do own the *FUCK'N* road.

xc.  **Heather Cohen:** Dude, you talk about how you can get people houses and get people not houses, an oh..

xci.   **Victor Smith:** What are you talking about? No, that *business* is going! It will not be here no more!

xcii.   **Heather Cohen:** I don't know what business, what.. is?

xciii.   **Victor Smith:** The *FUCK'N* handy man business!

xciv.   **Heather Cohen:** I don't own a business here…your making..

xcv.   **Victor Smith:** You, know.. You guys (Malene Garcia and Heather Cohen) were gunna try and get together and He (Denise Garcia) was gunna try and make you an ADU..

xcvi.   **Heather Cohen:** get me a ADU?

xcvii.   **Victor Smith:** I've got every text.

xcviii.   **Heather Cohen:**  Dude, I don't need an ADU.. I don't need an ADU

xcix.   **Victor Smith:** Listen..

c.   **Heather Cohen:** I have an ADU,

ci.   **Victor Smith:** I..

cii.   **Heather Cohen:** That's legally permitted.

ciii.   **Victor Smith:** I..

civ.   **Heather Cohen:** Upstairs where the garage is…

cv.   **Victor Smith:** Your running your mouth instead of listening!

cvi.   **Heather Cohen:** Your running your mouth!

cvii.   **Victor Smith:** Ok, get the *FUCK* off my property!

cviii.   **Heather Cohen:** Ok.

(Heather starts leaving)

cix.   **Victor Smith:** And stay off!  And stay off!   I'm calling the cops!

cx.    **Heather Cohen:** Ok, go ahead. call the cops, call the cops, bro. I will, I'm going to leave. Your asking me to leave, I'm going to leave. I just came here to say thank you for helping look for my kid.

cxi.    **Victor Smith:** Your welcome.

cxii.    **Heather Cohen:** If it happens again, may I ask that you would do it again, to save his life?

cxiii.    **Victor Smith:** If I would have known where he was I would have went and got him.

cxiv.    **Heather Cohen:** Well, of course…of course

cxv.    **Victor Smith:** I'm just pissed you guys think your gunna *FUCK'N* sue me.

cxvi.    **Heather Cohen:** No body thinks anything, my husband and I sent you dinner the first time you started pounding on my van telling me to move…

cxvii.    **Victor Smith:** I never touched your *FUCKING* car…

cxviii.    **Heather Cohen:** Yes you did.

cxix.    **Victor Smith:** Just get the FUCK off, and stay off!

cxx.    **Heather Cohen:** I will trust me nobody want to come over to your crusty *ASS* house, bro.

cxxi.    **Victor Smith:** Well, your crusty *ASS* house…

cxxii.    **Heather Cohen:** My house looks awesome. Your just jealous cause of the big *ASS* pool.

cxxiii.    **Victor Smith:** You got eight cars down there?!

cxxiv.    **Heather Cohen:** We don't have eight cars, we have 2 cars look it up.

cxxv.    **Victor Smith:** Now, you do..

cxxvi.  **Heather Cohen:**  You have 50 cars, you have all kinds of cars up and down this road. You have broke down FUCK'N trailers, you got unpermitted awnings back there.. Ya we know. Unpermitted awnings.

cxxvii.  **Victor Smith:** Get the FUCK off my property!

cxxviii.  **Heather Cohen:**  I am.. I'm going Victor... I'm going...Came down to say thank you.

67. Defendant Smith indirectly threatened to report Plaintiff Heather Cohen to Child Protective Services ("CPS") for child abuse, despite the absence of any factual or lawful basis for such allegations.

68. Between January 6 and January 8, 2026, Defendant Smith knowingly made a false report of child abuse to CPS, thereby causing a child welfare investigation to be initiated against Plaintiffs.

69. On January 8, 2026, King Cohen took his autistic child—who had eloped the prior day—and a newly purchased tracking device to retrace the child's path and ensure the device functioned properly so that a similar incident would not occur again. The first attempt to use the device failed. The second attempt failed. The third attempt also failed, at which point Victor Smith appeared and asked what was occurring.

 

70. King Cohen showed Smith the tracking device secured to his son's ankle and explained that he was testing the device to protect his disabled child. Victor Smith responded by disparaging Heather Cohen, calling her "crazy." King Cohen did not engage with the insult and instead reiterated the situation. King Cohen explained that he had a disabled child, did not want conflict, and needed cooperation from neighbors (to be on the same team)—including Victor Smith—in the event of a future emergency involving elopement. King Cohen further stated that he had done nothing to provoke Victor Smith's aggression and expressed that he was hurt by Smith's false reports to the city. Victor Smith denied making any report. King Cohen responded that he was in possession of an email containing false allegations authored by the County of San Diego and sent to Smith. Victor Smith offered no response.

**Smith's reports directly triggered enforcement and CPS action**

71. On or about January 9, 2026, Plaintiffs Heather Cohen and King Cohen became aware that the CPS investigation had been initiated based on Defendant Smith's false report. As a direct result of Defendant Smith's false allegations on or about January 9, 2026, a CPS investigator arrived at Plaintiffs' residence. January 9, 2026 Child Protective Services approached Heather Cohen and King Cohen claiming "SOMEONE" reported allegations of child abuse.



**Tractor Incident and Deputy Valencia's Refusal to Act**

72. On January 10, 2026, my wife, Heather Cohen loaded our eight children into her vehicle for the routine and innocuous purpose of checking the mail. After proceeding along the roadway, she lawfully parked and exited her vehicle to retrieve the mail (see, red arrow). At that moment, Victor Smith—observing that the vehicle was occupied by a woman and children—mounted and operated a skid steer, a piece of heavy industrial machinery, and drove it directly toward Heather Cohen and her vehicle. While Heather Cohen stood in front of her vehicle retrieving the mail, Victor Smith accelerated the skid steer toward her in a manner that reasonably appeared calculated to cause a collision or, at minimum, to place Heather Cohen and our eight children in imminent fear of serious bodily harm. Only at the last moment did Smith abruptly veer away, narrowly avoiding impact. Smith's conduct was deliberate, threatening, and objectively dangerous. His actions caused Heather Cohen and our eight children immediate and reasonable fear for their safety and lives.



Victor Smith's Maintained Road

COHEN PROPERTY

GARCIA PROPERTY

SMITH PROPERTY

Santa Maria Creek

OLIVE AVE

MAGNOLIA AVE

VICTOR SMITH

HEATHER COHEN

Start of County Maintained Road

PENN ST















January 10, 2026

Victor Smith

Reenactment

**Deputy Valencia refused documentation while acknowledging pattern**

73. On January 10, 2026, Plaintiff Heather Cohen contacted the Ramona Sheriff's Department to report the incident described above. The responding officer (Deputy Valencia) acknowledged that his department receives a substantial number of complaints concerning the roadway at issue, frequently originating from the same individual.

74. Nevertheless, the officer declined to document the incident or generate a police report. In refusing to take the report, the officer asserted that the conduct described did not meet the "threshold" for assault. Plaintiff Heather Cohen respectfully objected, noting that the officer appeared to be conflating the distinct legal concepts of assault and battery. Under settled legal definitions, battery requires unlawful physical contact, whereas assault does not. As defined in Black's Law Dictionary, assault consists of an intentional act that places another in reasonable apprehension of an imminent harmful or offensive contact, even where no physical contact ultimately occurs. Battery, by contrast, requires the consummation of that contact. Despite this clarification, the officer persisted in an erroneous statement of law, asserting that "battery" consisted of striking with an open hand and that "assault" required striking with an object—definitions that are inconsistent with established legal authority.

75. On this basis, the officer again refused to accept or memorialize the complaint. As a result, a credible report of conduct that placed a mother and her minor children in reasonable fear of imminent bodily harm was left undocumented, reinforcing the pattern alleged herein: that Defendant Victor Smith's conduct was met not with neutral law enforcement response, but with institutional inaction and de facto protection.

76. This refusal to take a report further evidences the systemic failure to intervene, investigate, or restrain Defendant Smith's escalating conduct, despite its objectively threatening nature.

77. Only after Plaintiff's spouse contacted Deputy Valencia and read the legal definition of assault verbatim did Deputy Valencia agree to take a report, which was later assigned a case number

78. After, King Cohen contacted law enforcement for assistance. Responding Deputy Valencia (Badge No. 19778) immediately began advocating on behalf of Victor Smith before conducting any field investigation. Deputy Valencia theorized, without investigation, that Victor Smith was elderly and therefore may not have seen Heather Cohen in the over 200ft Victor Smith drove at Heather Cohen and eight children .

79. Deputy Valencia then commenced his field investigation by interviewing Victor Smith, who claimed that his actions were justified because he was grading "his road.

80. King Cohen informed Deputy Valencia that this statement was false and clarified that Victor Smith's legally permitted grading area near his residence was nowhere near the public roadway where the incident occurred.

After completing his investigation, Deputy Valencia generated Case No. 26101244 and submitted the matter to the District Attorney for review, with a determination regarding felony assault pending on or about January 28, 2026.

81. Deputy Valencia's initial refusal denied Plaintiffs timely access to legal process and contributed to the ongoing risk posed by Defendant Smith's escalating conduct.



Smith's Maintained Road

Start of County Maintained Road

County

## CPS INVESTIGATION PROMPTY CLOSED

82. On January 14, 2026, Child Protective Services visited the residence of King Cohen and Heather Cohen to investigate a complaint made by an unidentified individual. Following its investigation, Child Protective Services found no neglect, no abuse, and no probable cause to support the complaint. The investigator expressed concern that Child Protective Services was being used as a tool of harassment and further noted that it was highly unusual for a complaint to contain the full legal names and dates of

birth of all minor children. King Cohen and Heather Cohen became extremely distressed and fearful upon learning this information, as such protected identifying information is not publicly available. Not even close friends or extended family are aware that six of the children have four legal names and two children have three legal names. All eight children are known exclusively by nicknames. The only instances in which their full legal names have been used are within confidential tax records and protected medical files.

83. As a result of Victor Smith's actions in initiating Child Protective Services involvement, King Cohen and Heather Cohen now face serious privacy and safety concerns regarding how their minor children's protected personal information was obtained, how it was disseminated, and to whom it may have been further disclosed. The CPS investigator promptly closed the investigation after determining that the allegations were unfounded on January 24, 2026,.

> It was closed on 1/24.
> You should be getting a
> Referral Closure Letter in
> the mail any day now.

84. On January 14, 2026, after Child Protective Services declined to take any action against Heather Cohen and King Cohen, Victor Smith filed a defective civil harassment Temporary Restraining Order against Heather Cohen (Case No. 26HR001271E



85. Victor Smith filed a defective civil harassment Temporary Restraining Order with copious misstatements of facts completely detethered from objective reality. Victor Smith is a liar.

86. Smith claimed Heather Cohen said, "FUCK you and your crusty house". But transcripts from this conversation indicate, Victor Smith is negligently misstating facts or in other words, Victor Smith is a liar. While it may be true Heather Cohen did indicate Victor Smith does indeed have a "crusty house," still Heather Cohen never said, "FUCK you and your crusty house". Rather Heather Cohen and Victor Smith's characterized both of each others residence as "crusty ASS".

87. Smith claimed Heather Cohen said "Fuck you MOTHERFUCKER". But transcripts from this conversation indicate, Victor Smith is again proven to be a liar. Victor Smith is negligently misstating facts. Heather Cohen never once said "Fuck you MOTHERFUCKER"

88. Smith claimed Heather Cohen said, "You don't know anything about autistic kids," But transcripts from this conversation indicate, Victor Smith is negligently misstating facts or in other words, Victor Smith is a liar. Heather Cohen never says "You don't know anything about autistic *kids*," Rather Heather Cohen claims Victor Smith does not know "Autism" or the extreme characteristics that may come with Autism (eloping, skin sensitivity, refusal of water, refusal of food, communication difficulty).

89. Smith claimed Heather Cohen said, "You don't own this road" .But transcripts from this conversation indicate, Victor Smith is negligently misstating facts. While it is true Heather Cohen said, *"You own this road"* it is not true Heather Cohen said, "You *don't* own this road".

90. In Victor Smith's filed defective civil harassment Temporary Restraining Order is filled with copious misstatements of facts completely detethered from objective reality to include "she then attacked me with profanity in front of my 13 year old granddaughter". But the careful reader will notice, transcripts from this conversation indicate, it is Victor Smith who attacks Heather Cohen with profanity in front of Victor Smith's 13 year old granddaughter and not Heather. The careful reader will not fail to notice Heather Cohen is first attacked with the threat of child protective services, secondly Heather Cohen is attacked by ad hominem, and thirdly Heather Cohen is attacked by Victor Smith's profanity 7 times before Heather Cohen says any.

I reported Heather to the county for a code violation in which she was cited. She was found to be in violation, then sent me a Cease & Desist Order with a 24 hour deadline to reply and be complicit with her demands. She then showed up to my front door unannounced and uninvited on 01/10/2026 to "make ammends". I declined and told her to get off my property. She then attacked me with profanity infront of my 13 year old granddaughter.

91. Victor Smith's defective TRO is filled with copious amounts of misstatements of facts which are completely detethered from objective reality to include, "she aggressively swung her arms and hands in a rapid and erratic manner while standing close to me" Heather Cohen never did the before mentioned, but when Victor Smith's granddaughter looks through the blinds to see who her grandfather is talking to. Heather notices, raising her hand chest high to politely wave hello saying, "Hi I'm Heather, nice to meet you."

*(This Attachment may be used with any Judicial Council form.)*
…er reason for stopping by was to thank me for helping find her autistic and non-verbal son. He's about 7 or 8 years old and wandered 1/4 miles away from their house on foot. I told Heather to leave and never return to my property and she became belligerent while yelling at me for asking her to leave. During this interaction, she aggressively swung her arms and hands in a rapid and erratic manner while standing close to me. Her body language, tone of voice, and physical gestures were intimidating and escalated the situation. My granddaughter is very shaken up with this incident as she has high anxiety already, and this triggered unnecessary trauma.

92. Victor Smith's defective TRO is filled with copious amounts of misstatements of facts which are completely detethered from objective reality to include, "My granddaughter is very shaken up with this incident as she has high anxiety already and this triggered unnecessary trauma". But Victor Smith's granddaughter's Brooklynn Pasquotto, was never shaken up by this incident as it never happened as Victor Smith describes. Victor Smith claims it was Heather Cohen that attacked Victor Smith in front of Brooklynn Pasquotto. But the facts indicate it was Victor Smith who attacked Heather Cohen 7 times with profanity before Heather Cohen said one. If Brooklynn Pasquotto was triggered, as Victor Smith claims then Brooklynn Pasquotto was triggered by Marion Joyce Bourke's false accusations, or Victor Smith's possible rejection if she doesn't hold the line.

-73-

93. Victor Smith's defective TRO is filled with copious amounts of misstatements of facts which are completely detethered from objective reality to include, " "I was grading my road",

household because she was so hostile at my front door. I told him to keep his wife away from my property.

Heather then made a false police report on 01/10/2026 (Report # E10408564) claiming I assaulted her with a skidsteer. I was grading my road because it's unpaved (dirt) and was not in savory condition due to the rece weather. A Sheriff knocked on my door later that evening and asked about Heather's allegations. I explaine that I was grading my road and did not have any interaction with Heather as she claims. She was collecting



Victor Smith's Maintained Road

COHEN PROPE

SMITH PROPE

Santa Maria Creek

MAGNOLIA AVE

County Maintain

End of County Maintained Road

Victor Smith was unlawfully grading the county maintained road. Victor Smith was not grading any where near Victor Smith's road he is lawfully permitted to maintain. Victor Smith is a liar. Only after Victor Smith drovn over 200 ft at Heather Cohen, did Victor Smith turned at the last second narrowly missing Heather and the eight children and then drove Victor Smith 200 ft before parking on the right hand shoulder. Victor Smith also claims, "She was collecting her mail and I stopped at least 60 ft. away from her," here, Victor Smith tells on himself. Victor Smith unwittingly places himself at the scene of the crime where he is not lawfully permitted to maintain the road, rather than at the scene of where he is lawfully permitted to maintain the road.

94. Victor Smith's defective TRO is filled with copious amounts of misstatements of facts which are completely detethered from objective reality to include, "I was grading my road because its unpaved (dirt) and was not in a savory condition due to the recent weather".

skidsteer. I was grading my road because it's unpaved (dirt) and was not in savory condition due to the recent weather. A Sheriff knocked on my door later that evening and asked about Heather's allegations. I explained



Here, Victor Smith tells on himself again.. Even if, there was "recent weather" the road was already just graded and in a savory condition. If the road was unsavory then it was made unsavory by Victor Smith when Victor Smith defaced it.



Skidsteer to Here                                    for Her Mail Here



95. Victor Smith failed to serve Heather Cohen initially January 25, 2026 with Victor Smith's defective civil harassment Temporary Restraining Order filled with copious misstatements of facts. The Judge allowed Victor Smith until February 5, 2026 to personally serve Heather Cohen with Smith's defective civil harassment Temporary Restraining Order filled with copious misstatements of facts, but Heather Cohen was never personally served with Victor Smith's TRO.

96. King Cohen filed a TRO against Victor Smith January 26, 2026. The TRO was immediately granted.

| | Notice of Court Hearing (Civil Harassment) | |
|---|---|---|
| 1/26/2026 | Filed By: *Petitioner* Cohen, King<br>Refers To: *Respondent* Smith, Victor | 🔒 Notice of Court Hearing (Civil Har<br>• Page Count: 3 |

97. If it was not for fear of being shot by Victor Smith, He would have been served January 26, 2026 by Dennis and Maleniee Garcia. Dennis and Maleniee Garcia declined to serve Victor Smith citing Victor Smith's "unpredictable behavior" and statements about "possessing firearms". Even, though the TRO would have stripped Victor Smith of his firearms, the "fear" of immediate retaliation was too insurmountable making them fear for their safety.

DECLARATION OF DENNIS GARCIA

I, Dennis Garcia, declare as follows:

1. I am an adult resident of San Diego County, California. I reside with my wife, Maleniee Garcia. I am competent to testify to the matters stated in this declaration, and all statements are based on my personal knowledge.

2. I am a neighbor of Heather Cohen and King Cohen, and I am also a neighbor of Victor Smith.

3. Beginning in or about 2024 and continuing through the present, I have personally experienced repeated harassment, intimidation, and disturbance by Victor Smith, including conduct directed at me, my wife, our guests, and our household.

4. Victor Smith has repeatedly called law enforcement regarding my household without legitimate cause, including during peaceful family gatherings, cookouts, and visits by relatives.

5. These repeated police calls have caused me embarrassment, anxiety, and concern that ordinary family activities would again result in law enforcement involvement.

6. Victor Smith has repeatedly claimed that the shared easement in front of our homes is "his road" and has attempted to impose his own rules regarding its use, threatening consequences if we do not comply.

7. On or about January 6, 2026, Victor Smith approached me on the shared easement in front of my home and the Cohen home. He was uninvited and without provocation and was walking a pit bull dog that he had never previously walked on this easement during the three years we have lived there.

8. During this encounter, Victor Smith used aggressive and threatening profanity, raised his voice, and acted in a confrontational manner. He stated that he was "calling the Sheriff" and that law enforcement would be coming the next morning to remove a "felon" allegedly living in my home.

9. These statements were based on Victor Smith's personal assumptions and beliefs. I understood them as threats intended to intimidate me through the misuse of law enforcement.

10. During the same incident, Victor Smith took photographs of nearby homes and of children present in the area. This conduct caused me to fear for my safety and the safety of others present.

11. Following this incident, on January 6, 2026, I joined with my wife, Heather Cohen, and King Cohen in signing and sending a Cease and Desist Notice With Offer to Resolve, requesting that Victor Smith stop harassing, threatening, intimidating, surveilling, and

1

involving law enforcement without cause. Victor Smith replied that same day that he would not comply with our request.

12. The weekend after the Cease and Desist Notice was sent, Victor Smith called law enforcement to my home at least five times during a family gathering, despite no emergency or disturbance occurring.

13. Despite receiving written notice, Victor Smith has continued the same pattern of conduct, including repeated police calls, following our guests to local stores, filming them, and accusing them of being "felons."

14. On or about January 26, 2026, the Cohens asked whether my wife and I would assist in delivering court temporary restraining order documents to Victor Smith. We declined because we feared for our safety.

15. My wife expressed concern that Victor Smith might shoot us due to his unpredictable behavior and statements about possessing firearms. Based on my own interactions with Victor Smith, I shared this fear.

16. Victor Smith's conduct has interfered with my quiet enjoyment of my home, caused emotional distress, and created ongoing fear of further harassment and escalation.

17. I have also personally observed the impact of Victor Smith's conduct on the Cohen family, including their increased isolation and the installation of security measures to protect themselves from continued harassment.

18. I am submitting this declaration voluntarily as a witness to the pattern of harassment and intimidation that I personally have experienced and observed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 2/7/2026 2026, at San diego , California.

Dennis Garcia

2

## DECLARATION OF MALENIEE GARCIA

I, Maleniee Garcia, declare as follows:

1. I am an adult resident of San Diego County, California. I reside with my husband, Dennis Garcia. I am competent to testify to the matters stated in this declaration, and all statements are based on my personal knowledge.

2. I am a neighbor of Heather Cohen and King Cohen, and I am also a neighbor of Victor Smith.

3. Beginning in or about 2024 and continuing through the present, I have personally experienced repeated harassment, intimidation, and disturbance by Victor Smith, including conduct directed at me, my husband, our guests and our household.

4. Victor Smith has repeatedly involved law enforcement against our household without legitimate cause, including calling the police during ordinary family gatherings, cookouts, and visits by relatives. These events were peaceful, lawful, and non-disruptive.

5. As a result of these repeated police calls, I have felt intimidated, anxious, embarrassed and fearful that ordinary family activities could again result in police involvement.

6. Victor Smith has also demanded that the easement in front of his home is "His Road" and demands we follow his rules and regulations regarding the road, or we will face consequences.

7. On or about December 2, 2025, I directly asked Victor Smith to leave me out of ongoing disputes. Instead of respecting this request, he made statements that I perceived as intimidating and retaliatory.

8. On multiple occasions, Victor Smith has made indirect threats, often framed as statements about what "someone" might do, or what "could happen," but always in a manner that suggested imminent consequences if we did not comply with his demands. Demands such as "If you want to stay out of this, you better stop talking to Joy" (Joy is his step daughter) and clean up his yard or "if *somebody* was to call animal control on you, your sheep cannot be within 50 feet of your structure. So like I said, I aint calling nobody, I'm asking respectfully, if you guys can get that cleaned up..."

9. Victor Smith has followed through on these threats by reporting me to the city code compliance officers which are closed and or in dispute. His claims are false and retaliatory. His actions are pernicious.

10. On or about January 6, 2026, Victor Smith approached my husband, Dennis Garcia, on the shared easement in front of my home and the Cohen home. Smith was uninvited and without provocation, while walking a pit bull dog (a dog he has never walked on this easement in the 3 years of us living at this home). During this encounter, Victor Smith threatened lawfare, used aggressive and threatening profanity, raised his voice, while provoking his dog to bark and act aggressive as well, and stated that he was "calling the Sheriff" and they will be here in the morning to get the "felon" living at my home.

1

Regardless of Victor Smith's unsupported assumptions and belief, I understand that even if his claims were true, this is not illegal nor does it warrant a call to Law enforcement. However, harassment, false reporting and retaliatory, malicious use of state and government agencies is illegal. (CCP§ 527.6) During that same incident, Victor Smith took photographs of nearby homes and of children present in the area. This conduct caused me to fear for my safety and the safety of the children present.

11. Following that incident, on January 6, 2026, due to fear and escalating hostility, I joined with Dennis Garcia, King Cohen, and Heather Cohen, in signing and sending a "Cease and Desist Notice With Offer To Resolve," requesting that Victor Smith stop harassing, threatening, intimidating, and involving law enforcement without cause. Victor replied the same day that he will "not comply."

12. The weekend after the Cease and Desist Notice was sent, Victor Smith called law enforcement to my home during a family cookout at least five times, without any legitimate emergency.

13. Despite this written notice, Victor Smith has continued to engage in the same pattern of behavior, including continued repetitive police calls, following my house guests to local stores and filming them in the store because he believes they are "felons" and intimidating communications.

14. On or about January 26, 2026 the Cohens asked if my husband and I would deliver Victor Smith court TRO documents, we declined. Not because we didn't want to help them feel safe, rather because we feared for our safety. I explained to the Cohens I thought Victor Smith "might shoot us because he is so unpredictable." Victor had made several claims about having many firearms in his home.

15. The cumulative effect of this conduct has interfered with my quiet enjoyment of my home, caused intentional infliction of emotional distress, and made me fearful of further unlawful surveillance, harassment, and threats of continuous escalation.

16. I have also witnessed the impact of the ongoing threats to Heather Cohen and the Cohen household. The family has had to install expensive cameras, and private property signs in attempts to keep Smith from continuing to harass them. I also witnessed the newly isolated Cohen family, in the recent weeks they have stayed inside at home when they were previously always outside enjoying their yard and newly built outdoor living area. The Cohen Family appears to be more isolated and reserved.

17. I am submitting this declaration voluntarily as a witness to the pattern of harassment and intimidation I personally have and continue to experience from Victor Smith.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on __2/7/__, 2026, at __San Diego__, California.

Maleniee Garcia

2

98. On January 29, 2026 Victor Smith and Marion Joyce Bourke were in this Court house (East County Division 250 E. Main St. El Cajon CA 92020) and were lost looking for Department E-21. Eventually, after Victor Smith and Marion Joyce Bourke went to almost every department but Department E-21, they finally proceeded to Department E-21. Marcus Brown was waiting for Victor Smith at Department E-21. Just before 9 Victor Smith walked in the hallway of Department E-21 and Marcus Brown approached Victor Smith saying, "Victor Smith?". True to form, and in front of the entire room full of people, Victor Smith replies, "No…" Marcus Brown sensing deception and said again more firmly, "Victor Smith, You've been served". Victor Smith received the documents, and was Personally served by Marcus Brown (1/29/26) with King Cohen's filed TRO.



99. On or about February 2, 2026 King Cohen became aware Deputy Valencia failed to identify Victor Smith's assault on Heather Cohen (Jan. 10, 2026) as such and alternatively identified it as miscellaneous. King Cohen waited at the Ramona Sherrif's Station to meet with Deputy Valencia to better understand, why Victor Smith's assault on Heather Cohen (Jan. 10, 2026) was not better identified under the correct issue. In a recorded interaction

cxxix. **King Cohen:** So obviously, I'm just u know a citizen. And you live this and do this, so.. and I understand there is a difference between perception and reality, you know TV and real life , so what is a felony assault. Maybe I don't have it right in

my mind, I'm teach able , I'm humble, what the.. what is that, then? Cause may be I have it, you know confused..?

cxxx.  **Deputy Valencia:** Theres assault with a deadly weapon. That was in my mind assault with a deadly weapon, cause he was on a bobcat. Nobody was hit. No great bodily injury occurred. Ok, in the aspect of Him driving along the easement, no one having to move out of the way. For, say your wife is on the easement He's driving towards Her, *if she had the need to jump out of the way to avoid getting hit*, I would have dictated that as a felony.

100.  On the same day February 2, 2026 King Cohen shared, Deputy Valencia's pervious statements as to why it was not dictated as a felony with Heather Cohen in which Heather Cohen replied, I couldn't do what He is asking me to do at the time there was no where to jump to.

101.  On the same day February 2, 2026 King Cohen returned to the Ramona's Sherrif's Office ready to share the new information. A different and new Deputy appeared and declined King Cohen request to speak with Deputy Valencia. King Cohen then ask If the new Deputy would get the Sargent in Charge. The Deputy declined again, this time claiming He doesn't have to get the Sargent in Charge, there is some policy that everyone doesn't get to speak to a Sargent and he chooses if someone speaks to a Sargent or not. King Cohen sat down and explained to the new Deputy what implicit biases meant. King Cohen asked the new Deputy to provide the exact policy that says what you are claiming. The New Deputy looked confused. King Cohen then told the new Deputy that one of two things would occur either the Sargent of the day would be brought out or Deputy Valencia.

-84-

102. Without delay the Sargent in Charge for the Ramona Sherrif's station (on February 2, 2026) came out and talked to King Cohen. Subsequently King Cohen relayed Deputy Valencia's curios claim "if she had the need to Jump out of the way to avoid getting hit, I would have dictated that as a felony". And Heather Cohen reply, "I couldn't do what He is asking me to do at the time there was no where to jump too". The Sargent in Charge for the Ramona Sherrif's station then said, "You cant jump out of the way of the way of a moving car…that not.. ya.. that to me doesn't.. doesn't make a whole lot of sense". The Sargent in Charge for the Ramona Sherrif's station agreed to reopen the case and assign it to a detective for further investigation.

103. On February 3, 2026 Victor Smith is served by the Sherrif's with King Cohen's TRO.



104. On February 5, 2026 Victor Smith fails to serve Heather Cohen with his defective TRO.

**Continuing Harm**

105. On February 5, 2026 Victor Smith violates King Cohen's TRO. While King Cohen is marshaling facts for this complaint and preparing for the TRO hearing (February 10, 2026) King Cohen was taking measurements of the road for sagacity and specificity. In the course of taking measurements Victor Smith and Marion Joyce Bourke became aware of King Cohen on the road and became curious. Victor Smith and Marion Joyce Bourke each mounted separate vehicles and set out to do recorded surveillance on King Cohen's activities.

King Cohen and the residents of the neighborhood usually politely wave when they drive by. But as Victor Smith and Marion Joyce Bourke drove by, there was no friendly waves of hello. Only a black cell phone recording, watching, surveilling. First by Marion Joyce Bourke then by Victor Smith. And then they drove by in the same manner as before again, only a black cell phone recording, watching, surveilling. First by Marion Joyce Bourke then by Victor Smith.



 

106. Victor Smith and Marion Joyce Bourke did not do anything but come out and record King Cohen. The total time of there trip with less then 10 mins. First Victor Smith and Marion Joyce Bourke drove out recording then went around the block and recorded as they went back to Victor Smith's house.

107. On February 5, 2026 King Cohen contacted 911 and reported the restraining order violation, citing both Victor Smith continued harassment and his continued surveillance his failure to turn in his weapons or declare no weapons as required by law with in 48 hours after being served the TRO.





108. As a result of Defendants' actions and omissions, Plaintiffs were subjected to repeated governmental scrutiny, threats of child welfare intervention, fear for their personal safety, and emotional distress.

109. Defendants' conduct, taken together, constitutes joint action between private individuals and state actors that deprived Plaintiffs of constitutional rights under color of state law.

110. Plaintiffs were treated differently than other similarly situated residents who reported threats or code concerns and whose complaints were documented and investigated.

111. Since Victor Smith's assault on January 10, 2026, the psychological and emotional toll on Plaintiffs' family has been profound and enduring. Plaintiffs' children are now reluctant to leave our home out of fear of passing Victor Smith's residence. What was once a simple, ordinary act—walking along our own avenue to check the mail—has become impossible. Plaintiffs' children repeatedly ask, several times each day, whether Victor Smith or Marion Joyce Bourke will hurt their family again. They express fear not only of these individuals, but of our own street.

112. Heather has suffered significant sleep disturbances, marked by sudden spikes of stress and anxiety. She has fallen into a state of pervasive depression, marked by hopelessness and profound feelings of helplessness. Tasks that once came easily—focusing during school, maintaining routine concentration—have become difficult. She now lives in a constant state of vigilance, compelled to document and record events out of fear that the harassment will escalate further.

113. Since the assault, King Cohen has experienced persistent difficulty concentrating. King Cohen suffer from chronic muscle tension in my neck, increased migraine frequency, and recurring physical pain consistent with prolonged stress and trauma. King Cohen experience terrifying nightmares involving further abuse perpetrated against my family by Victor Smith and Marion Joyce Bourke. These nightmares leave me emotionally exhausted and unable to fully rest.

114. As a family, we have withdrawn from friends, neighbors, and our broader community. Formerly safe and routine environments—such as leaving the house, going to the grocery store, or allowing our children to play outside—now provoke fear. My son exhibits hypervigilant behavior and is constantly scanning for danger, a response no child should have to develop.

115. Since the most recent incidents, I (King Cohen) have become increasingly irritable, emotionally depleted, and consumed by anguish. The ongoing escalation—moving from intimidation, to lawfare, to physical violence—has created an atmosphere of sustained fear. The use of third parties and governmental authorities by Victor Smith and Marion Joyce Bourke to intimidate us through false reports and legal manipulation has compounded this trauma, leaving my family with an overwhelming sense of powerlessness.

116. Collectively, these actions have substantially interfered with our normal use and enjoyment of our home and property. Our fear is not speculative—it is reasonable under the circumstances, grounded in a demonstrated pattern of escalation and abuse. The cumulative effect of these events has imposed an unbearable emotional burden on my family and has fundamentally altered how we live, move, and feel within what should be the safety of our own home.

117. The injuries suffered by Plaintiffs were not random or speculative; they were the foreseeable and direct result of Defendants' coordinated actions beginning on October 10, 2025, when Defendant Smith initiated false complaints that were transmitted and amplified through governmental channels without independent investigation.

118. By transmitting Defendant Smith's allegations as factual without verification, Defendant Leyva set in motion governmental enforcement mechanisms that subjected Plaintiffs to intrusive investigation, reputational harm, and ongoing surveillance under color of state authority.

119. The County's decision to open a violation case based on repurposed allegations— despite the prior closure of the same complaint—created an official record portraying Plaintiffs as violators of land-use laws, thereby stigmatizing Plaintiffs and exposing them to escalating scrutiny by government agencies.

120. The issuance of the Compliance Notice and continued enforcement actions forced Plaintiffs to divert substantial time, energy, and financial resources to respond to fabricated allegations, gather historical records dating back decades, and defend against enforcement that should never have been initiated.

121. Defendant Smith's knowingly false reporting to third parties and government agencies foreseeably caused additional governmental scrutiny, including a Child Protective Services investigation, which placed Plaintiffs' family under extreme emotional strain and exposed confidential information regarding their minor children.

122. Defendant Smith's threats to involve CPS, followed by an actual report, demonstrate a causal chain between Defendants' false allegations and the initiation of governmental intervention into Plaintiffs' family life.

123. The escalation from administrative harassment to physical intimidation—including the January 10, 2026 skid-steer incident—was a natural and foreseeable progression of Defendants' pattern of conduct after Plaintiffs resisted false enforcement actions.

124. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer substantial damages, including severe emotional distress, anxiety, depression, sleep disturbance, and physical manifestations of prolonged stress such as migraines, muscle tension, and chronic fatigue. Defendants' conduct has caused loss of quiet enjoyment of Plaintiffs' home, reputational injury within their community, interference with parental rights and family stability, and the diversion of significant time, energy, and financial resources to respond to false allegations and governmental investigations. The ongoing fear and trauma inflicted by Defendants have also placed significant strain on Plaintiffs' marital relationship, resulting in diminished companionship, affection, and loss of normal marital intimacy and consortium. These harms were foreseeable consequences of Defendants' coordinated actions and constitute damages according to proof at trial.

125. These harms were proximately caused by Defendants because a reasonable person would foresee that:

(a)     false     code     complaints     would     trigger     enforcement;

(b)     false     child-abuse     allegations     would     trigger     CPS     investigation;

(c) defamatory statements would damage Plaintiffs' reputation and relationships; and

(d) escalating harassment would produce emotional and physical injury.

126. Defendants' conduct was intentional, reckless, and undertaken with knowledge that governmental actors would rely upon the false information provided, thereby transforming private vendettas into official action under color of law.

127. The cumulative effect of these actions created a continuous chain of causation linking the October 10, 2025 false complaints to the later enforcement actions, CPS investigation, restraining order filings, law-enforcement encounters, and ultimately the physical intimidation incident of January 10, 2026.

128. Plaintiffs' damages were therefore not isolated incidents but the predictable outcome of a coordinated campaign of harassment and misuse of governmental authority.

## VI. FIRST CAUSE OF ACTION

42 U.S.C. § 1983 — Joint Action / Action Under Color of Law

(Against All Defendants)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. At all relevant times, Defendants Jonathan Leyva, Deputy Valencia (#19778), and Israel Garcia were government officials acting under color of state law.

3. Although Defendants Victor Smith and Marion Joyce Bourke are private individuals, they knowingly and willfully participated in joint action with state actors. Their conduct included supplying false information, instigating enforcement actions, initiating or influencing governmental investigations, and encouraging coercive state action directed toward Plaintiffs.

4. Defendants Smith and Bourke knew, or reasonably should have known, that their allegations would be relied upon by government officials and would foreseeably result in adverse state action against Plaintiffs.

5. State-actor Defendants adopted, transmitted, or relied upon these allegations without neutral investigation, thereby transforming private conduct into state action within the meaning of 42 U.S.C. § 1983.

6. The actions of all Defendants were interdependent, coordinated, and mutually reinforcing, constituting joint participation in conduct taken under color of state law.

7. As a direct and proximate result of Defendants' actions, Plaintiffs were deprived of rights secured by the Constitution, including but not limited to rights under the First and Fourteenth Amendments.

8. Plaintiffs suffered damages including emotional distress, reputational harm, interference with familial association, and loss of constitutional protections.

## VII. SECOND CAUSE OF ACTION

42 U.S.C. § 1983 — Procedural Due Process (Fourteenth Amendment)

(Against Defendants Leyva, Valencia, Smith, and Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. The Fourteenth Amendment prohibits state actors from depriving individuals of protected liberty or property interests without due process of law.

3. Plaintiffs possessed constitutionally protected interests, including: the right to the continued lawful use and enjoyment of their residence and property; The right to familial association free from unjustified state interference; and The right to fair notice, neutral decision-making, and a meaningful opportunity to be heard before adverse governmental action.

4. Defendant Jonathan Leyva, acting under color of state law, transmitted and relied upon allegations supplied by Defendant Victor Smith without independent verification or neutral investigation, thereby initiating or facilitating enforcement activity against Plaintiffs without adequate procedural safeguards.

5. Defendant Victor Smith knowingly supplied false allegations to government officials with the intent and foreseeable effect of triggering enforcement actions and investigations against Plaintiffs.

6. Defendant Marion Joyce Bourke knowingly supplied false information and falsely attributed investigative activity to Plaintiffs, foreseeably causing state

-94-

actors to rely upon such information in initiating or maintaining governmental scrutiny.

7. Defendant Deputy Valencia, acting under color of state law, initially refused to document Plaintiffs' report of assault and misrepresented governing legal standards, thereby denying Plaintiffs timely access to official process and meaningful procedural protections.

8. Plaintiffs were subjected to enforcement actions, investigative scrutiny, and threats of governmental intervention without verified factual basis, without adequate notice of the allegations being pursued, and without a meaningful opportunity to contest the accusations before adverse consequences occurred.

9. Defendants' combined actions deprived Plaintiffs of procedural due process rights secured by the Fourteenth Amendment.

10. As a direct and proximate result of these deprivations, Plaintiffs suffered emotional distress, reputational harm, interference with property and familial interests, and other damages according to proof.

## VIII. THIRD CAUSE OF ACTION

42 U.S.C. § 1983 — Substantive Due Process (Fourteenth Amendment)

(Against All Defendants)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. The Fourteenth Amendment protects individuals from arbitrary government action that infringes fundamental rights and "shocks the conscience."

3. Plaintiffs possess fundamental liberty interests including bodily integrity, personal security, and the right to familial association free from unjustified governmental intrusion.

4. Defendant Victor Smith engaged in escalating conduct that included threats, misuse of governmental mechanisms, and the operation of heavy machinery in a manner that placed Plaintiffs in reasonable fear of imminent bodily harm.

5. Defendants Leyva, Valencia, and Israel Garcia, acting under color of state law, through affirmative acts and deliberate omissions, increased Plaintiffs' vulnerability to harm by:

a. Initiating or facilitating enforcement actions without adequate factual basis;

b. Refusing to document credible threats of violence; and

c. Continuing enforcement activity despite the presentation of exculpatory evidence.

6. Defendant Marion Joyce Bourke knowingly supplied false reports and accusations that foreseeably escalated governmental scrutiny and contributed to a pattern of intimidation and coercion directed at Plaintiffs.

7. Defendants' conduct was arbitrary, oppressive, and undertaken with deliberate indifference to Plaintiffs' safety and constitutional rights, and served no legitimate governmental purpose.

8. Through their combined actions, Defendants placed Plaintiffs in a position of danger they otherwise would not have faced, thereby violating Plaintiffs' substantive due process rights.

9. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered emotional distress, fear for personal safety, interference with family integrity, and other damages according to proof.

## IX. FOURTH CAUSE OF ACTION

42 U.S.C. § 1983 — First Amendment Retaliation

(Against Defendants Victor Smith, Marion Joyce Bourke, and Jonathan Leyva)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. The First Amendment protects the right to petition government for redress of grievances, to report misconduct, and to object to governmental action without retaliation.

3. Plaintiffs engaged in protected activity, including:

   a. Objecting to false allegations and enforcement actions;

   b. Communicating with government officials regarding legal rights;

   c. Seeking law-enforcement assistance; and

   d. Asserting constitutional and statutory protections.

4. After Plaintiffs engaged in this protected activity, Defendants Smith and Bourke initiated or facilitated adverse actions against Plaintiffs, including false complaints, fabricated reports, threats of child-welfare intervention, and efforts to trigger governmental investigations.

5. Defendant Leyva, acting under color of state law, knowingly transmitted and relied upon Smith's allegations as a basis for governmental action despite the absence of independent verification, thereby facilitating retaliatory enforcement activity.

6. The actions of Defendants were substantially motivated by Plaintiffs' protected speech and petitioning activity.

7. The retaliatory conduct would chill a person of ordinary firmness from continuing to engage in protected First Amendment activity.

8. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiffs suffered emotional distress, reputational harm, interference with property and familial interests, and other damages according to proof.

## X. FIFTH CAUSE OF ACTION

42 U.S.C. § 1983 — Equal Protection (Class-of-One)

(Against Defendants Jonathan Leyva and Deputy Valencia)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons be treated alike unless a rational basis exists for differential treatment.

3. Plaintiffs were similarly situated to other residents who reported threats, code concerns, or enforcement issues within San Diego County.

4. Defendants Leyva and Valencia intentionally treated Plaintiffs differently from other similarly situated individuals by:

a. Initiating or facilitating enforcement actions based on unverified allegations;

b. Refusing to document Plaintiffs' report of threatening conduct while acknowledging a pattern of complaints involving Defendant Smith; and

c. Applying enforcement standards to Plaintiffs that were not applied to other residents.

5. There was no rational governmental basis for this differential treatment.

6. The unequal treatment was intentional and arbitrary and was not supported by legitimate law-enforcement or administrative objectives.

7. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered emotional distress, reputational harm, and interference with property and familial interests.

## XI. SIXTH CAUSE OF ACTION

42 U.S.C. § 1985(3) — Conspiracy to Interfere With Civil Rights

(Against All Defendants)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendants entered into an agreement, express or tacit, to deprive Plaintiffs of equal protection of the laws and equal privileges and immunities secured by the Constitution.

3. In furtherance of this agreement, Defendants committed overt acts including:

a. Supplying knowingly false allegations to governmental actors;

b. Initiating or facilitating enforcement actions lacking probable cause;

c. Refusing to document credible threats of violence; and

d. Fabricating or falsely attributing reports to Plaintiffs in order to trigger governmental scrutiny and coercive action.

4. Defendants' actions were motivated, at least in part, by discriminatory animus directed toward Plaintiff Heather Cohen based on sex, including targeting her status as a woman and mother through threats of child-welfare intervention and differential treatment not imposed upon similarly situated male residents.

5. Defendants knew or should have known that their coordinated conduct would result in deprivation of Plaintiffs' constitutional rights.

6. As a direct and proximate result of the conspiracy, Plaintiffs suffered injury to their persons, property, constitutional rights, and legally protected interests.

## XII. SEVENTH CAUSE OF ACTION

SEVENTH CAUSE OF ACTION

42 U.S.C. § 1986 — Failure to Prevent Conspiracy

(Against Defendants Jonathan Leyva and Deputy Valencia)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendants Jonathan Leyva and Deputy Valencia had actual or constructive knowledge of the conspiracy described in the preceding cause of action to deprive Plaintiffs of equal protection and constitutional rights.

3. Each of these Defendants possessed the authority, opportunity, and capacity to prevent or aid in preventing the wrongful acts carried out in furtherance of that conspiracy, including by:

a. Declining to transmit or rely upon unverified allegations;

b. Halting or refusing to facilitate retaliatory enforcement activity; and

c. Documenting and responding appropriately to credible threats of violence.

4. Despite such knowledge and authority, Defendants Leyva and Valencia knowingly neglected or refused to prevent the continuation of the unlawful conduct.

5. Their failure to act allowed the alleged conspiracy and its overt acts to continue, resulting in further deprivation of Plaintiffs' constitutional rights.

6. As a direct and proximate result of Defendants' failure to prevent the conspiracy, Plaintiffs suffered emotional distress, reputational harm, interference with familial and property interests, and other damages according to proof.

## XIII. EIGHTH CAUSE OF ACTION

Civil Assault (California Law)

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Under California law, an assault occurs when a defendant intentionally engages in conduct that causes another person to reasonably fear an imminent harmful or offensive contact.

3. On or about January 10, 2026, Defendant Victor Smith intentionally operated heavy machinery in a manner that caused Plaintiff Heather Cohen and nearby occupants of her vehicle to reasonably believe that an imminent collision or physical injury was about to occur.

4.  Defendant Smith's conduct was willful, unlawful, and done without consent or privilege.

5.  At the time of the incident, Plaintiff Heather Cohen was lawfully present and engaged in routine activity, and Defendant Smith knew or reasonably should have known that his actions would place Plaintiffs in immediate apprehension of harm.

6.  Plaintiffs experienced reasonable fear for their safety and the safety of their minor children as a direct result of Defendant Smith's conduct.

7.  Defendant Smith's actions were a substantial factor in causing Plaintiffs' emotional distress, fear, and other damages according to proof.

## XIV. NINTH CAUSE OF ACTION

Intentional Infliction of Emotional Distress (California Law)

(Against Defendants Victor Smith and Marion Joyce Bourke)

1.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2.  Under California law, intentional infliction of emotional distress occurs when a defendant engages in extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

3.  Defendants Victor Smith and Marion Joyce Bourke engaged in a pattern of extreme and outrageous conduct directed at Plaintiffs, including but not limited to:

a. Initiating false complaints and reports designed to trigger governmental scrutiny;

b. Making false accusations and defamatory statements;

c. Threatening or implying child-welfare intervention without lawful basis; and

d. Escalating confrontational and intimidating behavior despite knowledge of Plaintiffs' family circumstances.

4. Defendants' conduct exceeded all bounds tolerated in a civilized community and was undertaken intentionally or with reckless disregard for the emotional impact on Plaintiffs.

5. Plaintiffs suffered severe emotional distress, including fear, anxiety, sleep disturbance, humiliation, and disruption of family life.

6. Defendants' conduct was a substantial factor in causing Plaintiffs' emotional distress and resulting damages.

## XV. TENTH CAUSE OF ACTION

Defamation (Libel and Slander — California Law)

(Against Defendant Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Marion Joyce Bourke made and published false statements of fact about Plaintiff Heather Cohen to third parties, including statements accusing Plaintiff of authoring or initiating a fraudulent report that resulted in governmental investigation.

3. These statements were communicated to third parties, including individuals known to Defendant Bourke, and were reasonably understood as statements of fact rather than opinion.

4. The statements were false, and Defendant Bourke knew they were false or acted with reckless disregard for their truth or falsity.

5. Defendant Bourke later admitted authorship of the report and acknowledged falsely attributing it to Plaintiff Heather Cohen.

6. The false statements tended to injure Plaintiffs' reputation, expose them to hatred or ridicule, and cause harm to their personal and professional standing.

7. Plaintiffs suffered damages including reputational harm, emotional distress, and other losses according to proof.

## XVI. ELEVENTH CAUSE OF ACTION

Abuse of Process

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Under California law, abuse of process occurs when a person uses legal or administrative procedures for a purpose other than that for which the process was designed.

3. Defendants Victor Smith and Marion Joyce Bourke knowingly initiated and utilized governmental and administrative complaint processes against Plaintiffs.

4. After invoking these processes, Defendants used them for an improper ulterior purpose, including harassment, intimidation, retaliation, and the creation of pressure unrelated to any legitimate enforcement objective.

5. Defendants committed willful acts in the use of the process that were not proper in the regular conduct of the proceedings, including:

   a. Supplying knowingly false allegations;

   b. Repeatedly invoking enforcement mechanisms despite knowledge that the accusations lacked factual basis; and

   c. Using governmental involvement as leverage to threaten or coerce Plaintiffs.

6. Plaintiffs were harmed by Defendants' misuse of process, including emotional distress, reputational injury, interference with property and family interests, and other damages according to proof.

7. Defendants' conduct was a substantial factor in causing Plaintiffs' damages.

## XVII. TWELFTH CAUSE OF ACTION

Negligent Misrepresentation

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendants Victor Smith and Marion Joyce Bourke made representations of material fact to governmental officials and third parties concerning Plaintiffs, including statements regarding alleged violations and reports attributed to Plaintiffs.

3. At the time these representations were made, Defendants had no reasonable grounds for believing them to be true, or failed to exercise reasonable care in determining their accuracy.

4. Defendants intended or reasonably should have expected that government officials and others would rely upon these representations in taking action affecting Plaintiffs.

5. Government actors and third parties did in fact rely upon these representations, resulting in investigations, enforcement activity, and reputational harm directed toward Plaintiffs.

6. Plaintiffs were harmed by this reliance, including emotional distress, reputational injury, interference with property and familial interests, and other damages according to proof.

7. Defendants' negligent misrepresentations were a substantial factor in causing Plaintiffs' damages.

## XVIII. THIRTEENTH CAUSE OF ACTION

Violation of the California False Claims Act1

(Gov. Code §12651)

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. The California False Claims Act prohibits any person from knowingly presenting or causing to be presented false or fraudulent claims for payment or approval to a governmental entity, or from knowingly making false statements material to such claims.

3. Defendants Victor Smith and Marion Joyce Bourke knowingly provided false information and fabricated allegations to governmental entities, including reports designed to initiate official investigations and enforcement responses.

4. Defendants knew, or acted in deliberate ignorance of the truth, that these allegations were false and would cause governmental resources to be expended in responding to fabricated complaints.

5. The false statements were material because they influenced governmental decision-making, including investigative activity, administrative action, and allocation of public resources.

6. As a direct result of Defendants' conduct, governmental entities undertook actions they otherwise would not have taken, causing harm to Plaintiffs and misuse of public resources.

7. Plaintiffs suffered damages including reputational injury, emotional distress, and other losses according to proof.

## XIX. FOURTEENTH CAUSE OF ACTION

Violation of the Ralph Act — Civ. Code §51.7

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

-107-

2. California Civil Code §51.7 guarantees all persons the right to be free from violence or intimidation by threat of violence because of protected characteristics, including sex and gender.

3. On or about January 10, 2026, Defendant Victor Smith intentionally engaged in threatening conduct by operating heavy machinery in close proximity to Plaintiff Heather Cohen while she was present with her minor children, placing her in reasonable fear of imminent physical harm.

4. Defendant Smith's conduct constituted violence or a threat of violence within the meaning of Civil Code §51.7.

5. Defendant Smith targeted Plaintiff Heather Cohen in part because of her status as a woman and mother, including conduct directed specifically toward her while she was caring for her children and vulnerable to intimidation.

6. As a direct and proximate result of Defendant Smith's actions, Plaintiffs suffered fear, emotional distress, disruption of family security, and other damages according to proof.

7. Plaintiffs are entitled to actual damages, statutory remedies, and any other relief permitted under Civil Code §52(b).

## XX. **FIFTEENTH CAUSE OF ACTION**

Bane Act — Civil Code §52.1

*(Against Defendants Victor Smith, Jonathan Leyva, and Deputy Valencia)*

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. California Civil Code §52.1 prohibits interference, or attempted interference, with constitutional or statutory rights through threats, intimidation, or coercion.

3. Plaintiffs possessed clearly established rights, including the right to be free from unreasonable threats of violence, retaliatory enforcement actions, and coercive misuse of governmental authority.

4. Defendant Victor Smith engaged in threatening conduct, including operating heavy machinery toward Plaintiffs in a manner that placed them in reasonable fear of imminent bodily harm and was intended to intimidate and coerce.

5. Defendants Jonathan Leyva and Deputy Valencia, acting under color of state law, participated in or facilitated coercive conduct by relying upon unverified allegations, refusing to document credible threats, and allowing enforcement activity to proceed despite the presentation of exculpatory information.

6. The conduct of Defendants involved threats, intimidation, or coercion separate from and in addition to the underlying constitutional violations, including intimidation through fear of governmental intervention and threats affecting Plaintiffs' family integrity.

7. Defendants' actions were a substantial factor in interfering with Plaintiffs' exercise and enjoyment of their constitutional rights.

8. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered emotional distress, fear, reputational injury, interference with familial security, and other damages according to proof.

## XXI. SIXTEENTH CAUSE OF ACTION

Public Nuisance

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Under California law, a public nuisance is an unreasonable interference with a right common to the general public, including the safe use of public roadways and the peaceful enjoyment of residential neighborhoods.

3. Defendants Victor Smith and Marion Joyce Bourke engaged in a course of conduct that interfered with public rights, including:

   a. Operating machinery and engaging in confrontational behavior on or near public roadways in a manner that created safety hazards;

   b. Initiating repeated false complaints that triggered governmental presence and disrupted neighborhood peace; and

   c. Creating conditions that interfered with the safe and ordinary use of the surrounding area by residents.

4. Defendants' conduct affected not only Plaintiffs but also the surrounding community by creating an environment of intimidation, disturbance, and unreasonable interference with public safety and access.

5. Plaintiffs suffered harm that was different in kind from that suffered by the general public, including heightened fear for personal safety, interference with their ability to access their property and roadway, and emotional distress.

6. Defendants' actions were a substantial factor in causing the public nuisance and Plaintiffs' resulting damages.

-110-

## XXII. **SEVENTEENTH CAUSE OF ACTION**

Trespass

(Against Defendant Victor Smith)

1.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2.  At all relevant times, Plaintiffs were in lawful possession of their residence and surrounding property.

3.  Defendant Victor Smith intentionally entered, caused an Pitbul to enter, or otherwise intruded upon Plaintiffs' property without permission or lawful privilege.

4.  Defendant Smith knew or reasonably should have known that he did not have consent to enter or interfere with Plaintiffs' property interests.

5.  Defendant Smith's entry and intrusion interfered with Plaintiffs' exclusive possession and use of their property and created fear, disturbance, and disruption of Plaintiffs' quiet enjoyment.

6.  As a direct and proximate result of Defendant Smith's trespass, Plaintiffs suffered damages including emotional distress, interference with property rights, and other losses according to proof.

## XXIII. **EIGHTEENTH CAUSE OF ACTION**

Malicious Prosecution

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendants Victor Smith and Marion Joyce Bourke initiated or actively participated in prior civil or administrative proceedings against Plaintiffs by supplying allegations and complaints to governmental authorities.

3. The prior proceedings terminated in Plaintiffs' favor, including dismissal, closure, or determination that the allegations were unsupported.

4. At the time Defendants initiated or continued those proceedings, they lacked probable cause to believe the allegations were true.

5. Defendants acted with malice, including the intent to harass, retaliate against, or intimidate Plaintiffs rather than to pursue a legitimate legal objective.

6. As a direct and proximate result of Defendants' actions, Plaintiffs suffered damages including emotional distress, reputational injury, costs of defense, and interference with property and family interests.

## XXIV. NINETEENTH CAUSE OF ACTION

Negligent Interference With Prospective Economic Relations

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Plaintiffs had existing economic relationships with a reasonable probability of future benefit, including residential stability, business opportunities, and community-based economic activities connected to their property and household.

3. Defendants Victor Smith and Marion Joyce Bourke knew or reasonably should have known of Plaintiffs' ongoing economic relationships and the likelihood that governmental complaints and false allegations would interfere with those relationships.

4. Defendants engaged in negligent conduct, including making false or unsupported reports and initiating actions that foreseeably disrupted Plaintiffs' economic prospects.

5. Governmental scrutiny, investigations, and reputational harm resulting from Defendants' conduct interfered with Plaintiffs' ability to pursue economic opportunities and maintain beneficial relationships.

6. Plaintiffs suffered economic loss and related damages as a direct and proximate result of Defendants' negligent interference.

## XXV. TWENTIETH CAUSE OF ACTION

Privacy — Use of Name or Likeness

(Against Defendant Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Marion Joyce Bourke knowingly used Plaintiff Heather Cohen's name and identity in communications to third parties and governmental agencies by falsely attributing authorship of a fraudulent SSI report to Plaintiff.

3. Defendant Bourke made these statements without Plaintiffs' consent and with knowledge that the statements would be relied upon by others.

4. Defendant Bourke's use of Plaintiff's identity was made for Defendant's own benefit, including attempting to deflect responsibility for her own conduct, avoid personal liability, and manipulate third parties during an ongoing dispute.

5. Defendant Bourke's conduct resulted in governmental scrutiny, reputational harm, and emotional distress to Plaintiffs.

6. As a direct and proximate result of Defendant Bourke's unauthorized use of Plaintiff's name and identity, Plaintiffs suffered damages according to proof.

## XXVI. **TWENTY-FIRST CAUSE OF ACTION**

Privacy — False Light

(Against Defendant Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Marion Joyce Bourke publicly portrayed Plaintiff Heather Cohen in a false and misleading manner by falsely attributing the submission of a fraudulent SSI report to Plaintiff Heather Cohen and by making statements to third parties that Plaintiff was "crazy," dishonest, or responsible for governmental investigations.

3. These statements created a false impression that Plaintiff Heather Cohen engaged in unlawful or unethical conduct and improperly involved herself in governmental reporting processes.

4. The portrayal of Plaintiff in this manner would be highly offensive to a reasonable person because it falsely suggested misconduct involving government fraud investigations and child-welfare scrutiny.

5. Defendant Bourke knew the statements were false, or acted with reckless disregard for their truth or falsity, as evidenced by Defendant's subsequent written admissions that she authored the report herself and intentionally attempted to blame Plaintiff.

6. Defendant Bourke's conduct caused Plaintiff Heather Cohen to be viewed by others, including family members and governmental agencies, in a misleading and damaging light.

7. As a direct and proximate result of Defendant Bourke's actions, Plaintiffs suffered emotional distress, reputational injury, fear of governmental retaliation, and damages according to proof.

## XXVII. TWENTY-SECOND CAUSE OF ACTION

Privacy — Public Disclosure of Private Facts

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Plaintiffs and their minor children possessed a reasonable expectation of privacy in highly sensitive personal information, including protected identifying information, family circumstances, and confidential details contained within medical, educational, and tax records.

3. Defendants Victor Smith and Marion Joyce Bourke disclosed, or caused to be disclosed, private information about Plaintiffs and their minor children to third parties and governmental agencies without consent, including information that was not publicly available.

4. The disclosed information included full legal names and identifying details of Plaintiffs' minor children, which were later referenced during a Child Protective Services investigation. Such information was not known to the general public and had been confined to confidential records.

5. The disclosure of this private information would be highly offensive to a reasonable person because it exposed sensitive family data and subjected Plaintiffs and their children to governmental scrutiny, fear, and emotional distress.

6. The disclosed facts were not matters of legitimate public concern or newsworthiness and served no legitimate purpose.

7. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered emotional distress, fear for their children's safety, invasion of privacy, and damages according to proof.

## XXVIII. TWENTY-THIRD CAUSE OF ACTION

Stalking — Civil Code § 1708.7

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Victor Smith engaged in a course of conduct directed at Plaintiffs, including repeated threats, false reports to governmental agencies, surveillance, intimidation, and escalating confrontations occurring between October 2025 and February 2026.

3. Defendant Smith's conduct included, but was not limited to:

    a. Initiating false governmental complaints and enforcement activity;

    b. Threatening Plaintiffs with Child Protective Services involvement;

    c. Operating heavy machinery in a manner that placed Plaintiffs in reasonable fear of imminent bodily harm;

    d. Filing allegedly false restraining order documents;

    e. Repeated surveillance and monitoring of Plaintiffs despite court orders.

4. Defendant Smith made credible threats, either express or implied, that placed Plaintiffs in reasonable fear for their safety and the safety of their minor children. These threats included statements suggesting governmental retaliation, threats involving CPS, and conduct that reasonably appeared designed to intimidate or coerce.

5. Defendant Smith's pattern of conduct would cause a reasonable person to suffer substantial emotional distress.

6. Plaintiffs in fact suffered substantial emotional distress, including fear, anxiety, sleep disturbances, hypervigilance, and interference with the normal use and enjoyment of their home.

7. Defendant Smith's conduct served no legitimate purpose and was undertaken with intent to harass, intimidate, or coerce Plaintiffs.

8. As a direct and proximate result of Defendant Smith's conduct, Plaintiffs suffered damages according to proof.

## XXIX. **TWENTY-FOURTH CAUSE OF ACTION**

Malicious Prosecution — Wrongful Use of Civil Proceedings

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Victor Smith initiated and maintained civil proceedings against Plaintiff Heather Cohen, including the filing of a civil harassment Temporary Restraining Order containing material misstatements of fact.

3.  The civil proceedings were initiated without probable cause. Defendant Smith knew, or reasonably should have known, that the allegations contained within the filing were false or unsupported, including statements contradicted by recorded transcripts and other documentary evidence.

4.  Defendant Smith acted with malice and for an improper purpose, including retaliation, intimidation, and coercion arising from Plaintiffs' exercise of legal rights and refusal to submit to Defendant's demands.

5.  The prior civil proceedings terminated in Plaintiffs' favor, including Defendant Smith's failure to properly serve required documents and the absence of substantiated findings supporting the allegations made against Plaintiffs.

6.  As a direct and proximate result of Defendant Smith's wrongful initiation and continuation of the civil proceedings, Plaintiffs suffered emotional distress, reputational harm, litigation burdens, and damages according to proof.

## XXX. TWENTY-FIFTH CAUSE OF ACTION

Wrongful Use of Administrative Proceedings

(Against Defendant Marion Joyce Bourke)

1.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2.  Defendant Marion Joyce Bourke knowingly initiated or caused administrative and governmental processes to be triggered against Plaintiffs by submitting or causing false reports to governmental agencies, including reports relating to SSI and other investigative actions.

3. Defendant Bourke knew the allegations were false at the time they were made, as later demonstrated by Defendant's written admissions retracting the report and acknowledging responsibility for the false statements.

4. The administrative actions were initiated without probable cause and for an improper purpose, including deflecting blame from Defendant Bourke and causing governmental scrutiny of Plaintiffs.

5. The administrative proceedings were resolved in Plaintiffs' favor, including the withdrawal or retraction of the false report and the absence of any substantiated findings against Plaintiffs.

6. Defendant Bourke acted with malice and in conscious disregard of Plaintiffs' rights by intentionally misusing governmental processes as a tool of harassment and retaliation.

7. As a direct and proximate result of Defendant Bourke's conduct, Plaintiffs suffered emotional distress, reputational harm, interference with family integrity, and damages according to proof.

## XXXI. TWENTY-SIXTH CAUSE OF ACTION

Willful Suppression of Evidence

(Against Defendant Israel Garcia)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. At all relevant times, Defendant Israel Garcia acted under color of state law as a County Code Enforcement Officer responsible for conducting neutral investigations and maintaining accurate records.

3. Defendant Garcia knowingly concealed, ignored, or failed to disclose material exculpatory evidence relating to Plaintiffs' property, including documents demonstrating that the structure at issue qualified for an ordinance exception and had been previously documented as a utility shed.

4. Defendant Garcia possessed or was provided with drawings, permit-related materials, and historical documentation that contradicted the alleged violation but nevertheless continued enforcement actions while withholding or minimizing the significance of that evidence.

5. The suppressed or disregarded evidence was material because it directly negated the asserted basis for enforcement and demonstrated that no violation existed.

6. Defendant Garcia's conduct interfered with Plaintiffs' ability to defend themselves, deprived Plaintiffs of fair and neutral administrative process, and contributed to the continuation of enforcement actions lacking probable cause.

7. Defendant Garcia's actions were intentional, reckless, or undertaken in conscious disregard of Plaintiffs' constitutional rights.

8. As a direct and proximate result of Defendant Garcia's suppression of material evidence, Plaintiffs suffered emotional distress, reputational harm, and damages according to proof.

## XXXII. TWENTY-SEVENTH CAUSE OF ACTION

California False Claims Act — Gov. Code § 12651

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Victor Smith knowingly made or caused to be made false statements and false reports to governmental entities, including county enforcement agencies and child-welfare authorities.

3. Defendant Smith's false statements were material because they were capable of influencing governmental decision-making, including the initiation of enforcement investigations and allocation of public resources.

4. Defendant Smith knew the allegations were false or acted in deliberate ignorance or reckless disregard of their truth or falsity when submitting or causing such reports to be made.

5. As a result of Defendant Smith's conduct, governmental entities expended time, investigative resources, and public funds responding to false allegations.

6. Defendant Smith's actions caused the government to approve or authorize investigative actions and expenditures that would not have occurred absent the false information.

7. Plaintiffs suffered harm as a direct and proximate result of Defendant Smith's conduct, including emotional distress, reputational injury, and interference with their constitutional rights.

## XXXIII. TWENTY-EIGHTH CAUSE OF ACTION

Ralph Act — Acts or Threats of Violence

(California Civil Code § 51.7)

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Plaintiff Heather Cohen is a woman and mother of minor children and is therefore a member of a class protected under California Civil Code § 51.7, which guarantees all persons the right to be free from violence or intimidation by threat of violence.

3. Defendant Victor Smith committed acts and threats of violence against Plaintiffs, including intentionally operating heavy machinery in a manner that placed Plaintiff Heather Cohen and her minor children in reasonable fear of imminent bodily harm.

4. Defendant Smith's conduct included escalating intimidation, threats of governmental retaliation, and statements intended to instill fear and coercion, which would cause a reasonable person to fear for personal safety.

5. Defendant Smith's conduct was motivated, at least in part, by Plaintiffs' protected characteristics and activities, including Plaintiff Heather Cohen's status as a woman asserting legal rights and seeking assistance from governmental authorities.

6. Plaintiffs were harmed as a result of Defendant Smith's conduct, including emotional distress, fear for personal safety, and interference with the use and enjoyment of their home.

7. Defendant Smith's acts and threats of violence were a substantial factor in causing Plaintiffs' harm.

## XXXIV. **TWENTY-NINTH CAUSE OF ACTION**

Unreasonable Search or Seizure — 42 U.S.C. § 1983

(Against Defendant Israel Garcia)

1.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2.  At all relevant times, Defendant Israel Garcia acted under color of state law as a County Code Enforcement Officer.

3.  Plaintiffs possessed a reasonable expectation of privacy in their property, driveway easement, and areas not open to the general public.

4.  Defendant Garcia entered onto or conducted surveillance of Plaintiffs' property and gathered evidence without a warrant, valid consent, or exigent circumstances.

5.  Defendant Garcia asserted authority to access Plaintiffs' private easement despite Plaintiffs' express objections and without demonstrating lawful justification.

6.  The entry and investigative conduct constituted a search or seizure within the meaning of the Fourth Amendment.

7.  Defendant Garcia's conduct was objectively unreasonable because it relied upon unverified complaints, lacked probable cause, and ignored available exculpatory information.

8.  As a direct and proximate result of Defendant Garcia's unlawful search and seizure, Plaintiffs suffered invasion of privacy, emotional distress, and damages according to proof.

## XXXV. **THIRTIETH CAUSE OF ACTION**

Official Policy or Custom — Monell Liability

(42 U.S.C. § 1983)

(Against County of San Diego / Municipal Defendants)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. At all relevant times, Defendants Israel Garcia, Jonathan Leyva, and Deputy Valencia acted pursuant to policies, customs, or longstanding practices attributable to their municipal employer.

3. A policy or custom existed in one or more of the following forms:

   a. A practice of accepting and acting upon unverified complaints without neutral investigation;

   b. A practice of refusing to document or properly classify credible reports of threats or violence;

   c. A practice of permitting code-enforcement officers to impose requirements not contained in governing ordinances;

   d. A failure to train or supervise employees regarding constitutional limitations on enforcement actions, evidence evaluation, and citizens' Fourth and Fourteenth Amendment rights.

4. Defendant Israel Garcia indicated that acceptance of exculpatory documentation depended upon internal practices or supervisory approval rather than the governing ordinance, demonstrating the existence of a policy or custom influencing enforcement decisions.

5. Defendant Deputy Valencia represented that internal "threshold" practices governed whether assault complaints would be documented, reflecting a municipal custom affecting Plaintiffs' access to lawful police protection.

6. These policies or customs were maintained with deliberate indifference to the constitutional rights of persons such as Plaintiffs, including the right to due process, equal protection, and freedom from unreasonable searches.

7. The policies or customs were the moving force behind the constitutional violations alleged herein, including selective enforcement, refusal to document threats, and continuation of enforcement actions lacking probable cause.

8. As a direct and proximate result of the municipal policies and customs, Plaintiffs suffered deprivation of constitutional rights, emotional distress, and damages according to proof.

## XXXVI. THIRTY-FIRST CAUSE OF ACTION

Local Government Liability — Policy or Custom

(42 U.S.C. § 1983)

(Against County of San Diego / Municipal Defendants)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. At all relevant times, the municipal Defendants, through their employees and agents, maintained policies, customs, or practices that resulted in the deprivation of Plaintiffs' constitutional rights.

-126-

3. These policies or customs included:

a. Permitting enforcement actions to proceed without adequate verification of complaints;

b. Allowing officers to rely upon incomplete or misleading information while disregarding exculpatory evidence;

c. Failing to adequately train and supervise personnel regarding citizens' Fourth Amendment rights against unreasonable searches and seizures and Fourteenth Amendment rights to due process and equal protection.

4. Municipal policymakers knew, or should have known, that these practices created a substantial risk of constitutional violations yet failed to take corrective action.

5. The constitutional violations committed by individual defendants were not isolated incidents but were undertaken pursuant to these municipal practices and customs.

6. The policies or customs described herein were a moving force behind the violations of Plaintiffs' rights, including unlawful searches, selective enforcement, and denial of procedural protections.

7. As a direct and proximate result of the municipal Defendants' policies or customs, Plaintiffs suffered emotional distress, reputational injury, invasion of privacy, and damages according to proof.

## XXXVII. THIRTY-SECOND CAUSE OF ACTION

**Violation of Federal Civil Rights — In General**

(42 U.S.C. § 1983)

(Against Defendant Israel Garcia)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. At all relevant times, Defendant Israel Garcia acted under color of state law as a County Code Enforcement Officer.

3. Defendant Garcia, through affirmative acts and omissions, deprived Plaintiffs of rights secured by the Constitution and laws of the United States, including but not limited to:

    a. The Fourth Amendment right to be free from unreasonable searches and seizures;

    b. The Fourteenth Amendment rights to procedural and substantive due process;

    c. The right to equal protection of the laws.

4. Defendant Garcia conducted enforcement actions based on unverified allegations, disregarded exculpatory evidence, and imposed requirements not contained within governing ordinances.

5. Defendant Garcia's conduct was intentional, reckless, or undertaken with deliberate indifference to Plaintiffs' constitutional rights.

6. As a direct and proximate result of Defendant Garcia's actions, Plaintiffs suffered invasion of privacy, emotional distress, interference with the use and enjoyment of their property, and damages according to proof.

## XXXVIII. **THIRTY-THIRD CAUSE OF ACTION**

Negligent Interference With Prospective Economic Relations

(Against Defendant Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Plaintiffs maintained existing and prospective economic relationships with third parties, including neighbors, community members, and potential service or business opportunities that carried a reasonable probability of future economic benefit.

3. Defendant Marion Joyce Bourke knew of Plaintiffs' relationships within the community and knew that false statements or governmental allegations could disrupt those relationships.

4. Defendant Bourke negligently made false statements and initiated or caused governmental reports that foreseeably interfered with Plaintiffs' economic relationships, including by damaging Plaintiffs' reputation and creating fear or hesitation among third parties.

5. Defendant Bourke failed to exercise reasonable care in determining the truth of her statements and acted without reasonable grounds when attributing false conduct to Plaintiffs.

6. Defendant Bourke's conduct disrupted Plaintiffs' prospective economic relationships and caused loss of opportunities, reputational harm, and damages according to proof.

7. As a direct and proximate result of Defendant Bourke's negligent conduct, Plaintiffs suffered economic and non-economic damages.

## XXXIX. **THIRTY-FOURTH CAUSE OF ACTION**

Public Nuisance

(California Civil Code §§ 3479–3480)

(Against Defendant Victor Smith)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Victor Smith engaged in conduct that created an unreasonable interference with a right common to the general public, including the safe use of a shared roadway and the peaceful enjoyment of the surrounding residential community.

3. Defendant Smith's conduct included, but was not limited to:

   a. Operating heavy machinery in a dangerous and intimidating manner on or near the roadway;

   b. Engaging in repeated harassment and intimidation affecting neighboring residents;

   c. Creating conditions that interfered with safe access to Plaintiffs' residence and the surrounding area.

4. Defendant Smith's actions affected multiple members of the community and created a condition that was injurious to health, offensive to the senses, and an obstruction to the free use of property.

5. Plaintiffs suffered harm that was different in kind from that suffered by the general public, including direct threats to their safety, interference with access to their home, emotional distress, and disruption of family life.

6. Defendant Smith's conduct was a substantial factor in causing the nuisance and the resulting harm to Plaintiffs.

7. As a direct and proximate result of Defendant Smith's conduct, Plaintiffs suffered damages according to proof.

## XL. THIRTY-FIFTH CAUSE OF ACTION

Trespass

(California Law)

(Against Defendant Israel Garcia)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. At all relevant times, Plaintiffs were in lawful possession and control of their residence, driveway easement, and surrounding property areas not open to the general public.

3. Defendant Israel Garcia intentionally entered onto or caused entry onto Plaintiffs' property while acting in his capacity as a code enforcement officer.

4. Defendant Garcia entered without a valid warrant, without lawful consent, and without legal justification, despite Plaintiffs' express objections.

5. The areas entered were private portions of Plaintiffs' property and were not accessible to the general public.

6. Defendant Garcia's entry interfered with Plaintiffs' exclusive possession and use of their property and caused fear, disruption, and invasion of privacy.

7. Defendant Garcia knew or reasonably should have known that his entry exceeded any lawful authority granted to him.

8. As a direct and proximate result of Defendant Garcia's trespass, Plaintiffs suffered emotional distress, invasion of privacy, and damages according to proof.

## XLI. THIRTY-SIXTH CAUSE OF ACTION

Opinions as Statements of Fact

(California Defamation Principles)

(Against Defendant Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Marion Joyce Bourke made statements about Plaintiffs that were framed as opinions but implied the existence of undisclosed, false, and defamatory facts.

3. These statements included characterizations that Plaintiff Heather Cohen was dishonest, unstable, or responsible for governmental investigations, which were presented in a manner that suggested factual knowledge rather than mere personal opinion.

4. A reasonable listener or reader would have understood Defendant Bourke's statements as assertions of fact because they were made in connection with specific alleged events, governmental reports, and purported misconduct.

5. Defendant Bourke knew the implied factual assertions were false, or acted with reckless disregard for their truth or falsity.

6. Defendant Bourke communicated these statements to third parties, including individuals within the community and governmental entities, causing Plaintiffs to be viewed in a false and damaging light.

7. As a direct and proximate result of Defendant Bourke's conduct, Plaintiffs suffered reputational injury, emotional distress, and damages according to proof.

## XLII. THIRTY-SEVENTH CAUSE OF ACTION

Misrepresentations Made to Persons Other Than the Plaintiff

(California Law)

(Against Defendant Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendant Marion Joyce Bourke knowingly made false statements and misrepresentations about Plaintiffs to third parties, including governmental agencies, community members, and individuals connected to Plaintiffs' personal and professional relationships.

3. These misrepresentations included false allegations concerning Plaintiff Heather Cohen's conduct, credibility, and involvement in governmental reporting processes.

4. Defendant Bourke intended or reasonably should have expected that third parties would rely upon these statements and act upon them.

5. Third parties did in fact rely upon Defendant Bourke's misrepresentations, resulting in governmental scrutiny, reputational damage, and interference with Plaintiffs' relationships.

6. Defendant Bourke knew the statements were false, or acted with reckless disregard for their truth or falsity.

7. As a direct and proximate result of Defendant Bourke's conduct, Plaintiffs suffered emotional distress, reputational injury, and damages according to proof.

## XLIII. THIRTY-EIGHTH CAUSE OF ACTION

Privacy — Intrusion Into Private Affairs

(California Common Law)

(Against Defendants Victor Smith and Israel Garcia)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Plaintiffs possessed a reasonable expectation of privacy in their home, driveway easement, family activities, and personal affairs occurring on private residential property.

3. Defendants Victor Smith and Israel Garcia intentionally intruded into Plaintiffs' private affairs by engaging in surveillance, monitoring, and investigative conduct directed at Plaintiffs' residence and family activities.

4. Defendant Smith's conduct included repeated monitoring, intimidation, and observation of Plaintiffs' home and movements in a manner designed to harass and interfere with Plaintiffs' privacy.

5. Defendant Garcia, acting under color of state law, entered or observed areas of Plaintiffs' property not open to the general public and gathered information without lawful justification or valid consent.

6. The intrusions were highly offensive to a reasonable person because they involved interference with the sanctity of the home and monitoring of a family with minor children.

7. Plaintiffs suffered emotional distress, fear, and invasion of privacy as a direct and proximate result of Defendants' conduct.

## XLIV. **THIRTY-NINTH** CAUSE OF ACTION

Negligence

(Against Defendants Victor Smith and Marion Joyce Bourke)

1. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

2. Defendants Victor Smith and Marion Joyce Bourke owed Plaintiffs a duty to exercise reasonable care in their conduct so as not to cause harm to Plaintiffs or their minor children.

3. Defendants breached their duty of reasonable care by engaging in negligent acts and omissions, including but not limited to:

   a. Making false or reckless reports to governmental agencies without reasonable investigation;

   b. Engaging in conduct that foreseeably created fear, disruption, or risk of harm;

   c. Failing to act as a reasonable person would under similar circumstances.

4. Plaintiffs were harmed as a result of Defendants' conduct, including emotional distress, reputational injury, interference with property use, and disruption of family life.

-135-

5. Defendants' negligence was a substantial factor in causing Plaintiffs' harm.

6. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs suffered damages according to proof.

## XLV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

1. For general and special damages in an amount to be proven at trial;

2. For compensatory damages for emotional distress, invasion of privacy, reputational harm, and interference with family and property rights;

3. For statutory damages, penalties, and treble damages where authorized by law;

4. For punitive and exemplary damages against individual Defendants whose conduct was malicious, oppressive, or in reckless disregard of Plaintiffs' rights;

5. For declaratory relief declaring Defendants' conduct unlawful and unconstitutional;

6. For injunctive relief prohibiting Defendants from continuing or repeating the unlawful acts alleged herein;

7. For reasonable attorneys' fees and costs where permitted by statute, including but not limited to 42 U.S.C. § 1988 and applicable California law;

8. For pre-judgment and post-judgment interest as allowed by law; and

9. For such other and further relief as the Court deems just and proper.

## XLVI. BENCH TRIAL DEMAND

1. Plaintiffs hereby request a bench trial on all issues so triable.

## XLVII. CONCLUSION

1. Defendants' conduct, taken as a whole, reflects a coordinated misuse of governmental authority and legal process that exceeds mere negligence or isolated error. Private individuals knowingly invoked state power through false allegations and fabricated reports, while state actors affirmatively facilitated, ratified, or refused to halt that misconduct. The result was the initiation and escalation of sham enforcement actions, denial of procedural protections, retaliation for protected activity, and the creation of a continuing threat to Plaintiffs' safety and family integrity. Plaintiffs were not afforded neutral decision-making, fair notice, or meaningful access to legal process. Instead, Defendants' interdependent actions operated to weaponize government mechanisms against a private family, embolden escalating intimidation, and suppress Plaintiffs' efforts to seek protection and redress. These actions deprived Plaintiffs of rights secured by the First and Fourteenth Amendments and violated clearly established federal and state law. Absent judicial intervention, there exists a substantial risk that Defendants' misconduct will continue, resulting in further constitutional injury and irreparable harm. Plaintiffs therefore respectfully submit that this Second Amended Complaint states plausible and well-pleaded claims for relief, and that declaratory, injunctive, and monetary remedies are necessary to vindicate Plaintiffs' rights and prevent further abuse of governmental power.

DATED: Feb. 9, 2026.

Respectfully submitted,

/s/ *Heather Cohen*
_____

Heather Cohen aka Mrs. DOOM
Plaintiff, Pro Se
1035 Olive Ave.
Ramona, CA 92065
T: 808-631-7338
Email: atarahcohen@gmail.com


Respectfully submitted,

/s/    *King Cohen*
_____

King Cohen aka Prof. DOOM xXx
Plaintiff, Pro Se
1035 Olive Ave.
Ramona, CA 92065
T: 858-663-1424
Email: 67kingdavid.cohen@gmail.com